109 T.C. No. 17


UNITED STATES TAX COURT


UNITED CANCER COUNCIL, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2008-91X.          Filed December 2, 1997.


Petitioner was organized in 1963.  In a ruling letter dated Mar. 31, 1969, respondent ruled that petitioner was exempt from Federal income tax and was an eligible charitable donee.  Secs. 501(a), 501(c)(3), 170(c), I.R.C. 1954.

On June 11, 1984, petitioner entered into a 5-year fundraising contract (the Contract) with a professional fundraiser (W&H).  During 1984 through 1989, W&H helped petitioner conduct a nationwide direct mail fundraising campaign.  Petitioner received a total of about $2¼ million in net fundraising revenue under the Contract.  W&H received more than $4 million in fees from petitioner, and in addition derived substantial income from exploiting the co-ownership rights in petitioner's mailing list, which rights had been granted to W&H under the Contract.

On Nov. 2, 1990, respondent revoked the favorable ruling letter retroactively to June 11, 1984.  Petitioner initiated the instant action under sec. 7428, I.R.C. 1986, for a declaratory judgment that it qualifies as an exempt organization and as an eligible charitable donee.

1. <u>Held</u>:  W&H was an "insider" for purposes of the inurement provisions of secs. 501(c)(3), 170(c)(2)(C), I.R.C. 1954 and 1986.

2. <u>Held</u>, <u>further</u>, there was an inurement of net earnings to W&H; petitioner fails to qualify as an exempt organization or as an eligible charitable donee.

3. <u>Held</u>, <u>further</u>, respondent's retroactive revocation of the favorable ruling letter back to June 11, 1984, was not an abuse of discretion.

<u>Leonard J. Henzke, Jr.</u>, <u>James W. Curtis, Jr.</u>, <u>MacKenzie Canter III</u>, <u>Theodore R. Weckel, Jr.</u>, and <u>Joseph Greif</u>, for petitioner.[*]

<u>Dianne I. Crosby</u>, <u>Deidre A. James</u>, <u>Sandra M. Jefferson</u>, and <u>Chalmers W. Poston, Jr.</u>, for respondent.

TABLE OF CONTENTS

| | Page |
|---|---|
| Introduction and Statement of Issues | 4 |
| Findings of Fact | 5 |
| Background and Summary | 6 |
| Direct Mail Fundraising | 14 |

---

[*] After the trial was held and opening briefs were filed, but before the parties filed their answering briefs, <u>Theodore R. Weckel, Jr.</u>, was given permission to withdraw from the instant case.

Briefs amici curiae were filed by <u>Thomas A. Troyer</u>, <u>Albert G. Lauber, Jr.</u>, and <u>Catherine E. Livingston</u>, as attorneys for American Heart Association, American Lung Association, American Cancer Society, and Independent Sector (hereinafter sometimes collectively referred to as American/Sector), and by <u>Roger Warin</u> as attorney for Non-Profit Mailers Federation (hereinafter sometimes referred to as Mailers).

W&H; AICR............................................... 21

The Contract; Related Agreements ....................... 25
    A. The Contract (June 11, 1984) ..................... 25
    B. The Escrow Agreement ............................ 29
    C. Petitioner's "Draw" Arrangement.................. 32
    D. Agreement To Continue At 50 Percent The Percentage
       Of Net Housefile Mailing Income The Fundraising
       Contract Required To Be Retained In The Escrow
       Account To Reimburse W&H........................ 36
    E. April 1987 Addendum to the Contract.............. 36

Direct Mail Fundraising Campaign: 1984--1989............ 40
    A. In General....................................... 40
    B. W&H's Advances Of The Initial
       Capital To Conduct The Direct Mail
       Fundraising Campaign........................... 44
    C. Vendors Who Furnished Goods Or Services.......... 45
    D. Rentals Of Mailing Lists........................ 46
    E. Sweepstakes Mailings............................ 53
    F. Adverse Publicity ............................... 60
    G. Petitioner's Escrow Account-Related Problems...... 64
       1. Draws and Petitioner's Dispute with W&H
          Over the Calculation of Cumulative
          Net Mailing Campaign Revenue.................. 64
       2. W&H's Purchase And Invoice Control
          Procedures.................................... 68
    H. Petitioner's Attempt To Obtain A Copy of
       Its Housefile.................................. 76

Petitioner's and W&H's Respective Accounting
Treatments Of The Direct Mail Campaign's
Revenue And Expenses................................... 78

Petitioner's Allocation Of Expenses Between
Fundraising And Public Education....................... 80

Opinion................................................ 85

I. Status Under Sections 501(c)(3) And 170(c)(2)........ 85
    A. W&H As Insider ................................. 90
    B. Did Any Of Petitioner's Net Earnings
       Inure To W&H?.................................. 98

II. Retroactivity Of Respondent's Revocation Of The Prior
     Favorable Ruling Letter Issued To Petitioner........ 111

CHABOT, Judge:  Petitioner initiated this action pursuant to section 7428[1] for a declaratory judgment that for all periods beginning on or after June 11, 1984, it qualifies as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) and that it qualifies as an organization described in section 170(c)(2).  The action was initiated after respondent revoked a favorable ruling letter which had been issued to petitioner.  The revocation is retroactive to June 11, 1984.  Petitioner has exhausted its administrative remedies and satisfied the other statutory predicates (sec. 7428(b); Rule 210(c))[2].

The issues for decision are as follows:[3]

(1) Whether petitioner is operated exclusively for charitable, educational, scientific, or other exempt purposes under sections 501(c)(3) and 170(c)(2)(B).

(2) Whether any part of petitioner's net earnings inured to the benefit of private shareholders or

---

[1]    Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 or the Internal Revenue Code of 1986, as in effect for the period of time referred to.

[2]    Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]    In United Cancer Council, Inc. v. Commissioner, 100 T.C. 162 (1993), we denied petitioner's motion for summary judgment, holding that the due process clause of the Fifth Amendment to the Constitution does not require respondent to initiate judicial review before revoking the ruling letter issued to petitioner.

individuals, within the meaning of sections 501(c)(3) and 170(c)(2)(C).

(3) If the answer to issue (1) is "no", or the answer to issue (2) is "yes", then whether the retroactive revocation of the favorable ruling letter was an abuse of discretion.

The parties have also raised ancillary issues, including the following: (1) whether petitioner's direct mail fundraising arrangement with Watson and Hughey Company (hereinafter sometimes referred to as W&H) constitutes a joint venture; (2) whether a portion of the direct mail campaign expenses petitioner incurred are properly allocable to public education; and (3) whether the mailings made under petitioner's nonprofit mail permits violate United States Postal Service regulations as cooperative mailings due to the nature of the fundraising arrangement between petitioner and W&H, and to W&H's co-ownership rights in petitioner's mailing list.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

On June 1, 1990, petitioner filed for bankruptcy under chapter 7 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Indiana, Indianapolis Division. On January 28, 1991, the bankruptcy court granted petitioner's

motion to lift the automatic stay and permit petitions to be filed in the Tax Court for purposes of initiating the instant declaratory judgment action and a related deficiency proceeding.[4]

When the petition was filed in the instant case, petitioner was a not-for-profit corporation in bankruptcy in Indiana. Gregory Fehribach, the trustee in bankruptcy, maintained an office in Indianapolis, Indiana.

### Background and Summary

Petitioner was organized in 1963 as a Delaware not-for-profit corporation. Petitioner is a membership organization. Its members consist of local cancer agencies throughout the country. By letter dated March 31, 1969, respondent ruled that petitioner was exempt from Federal income tax under section 501(c)(3) and that donors may deduct contributions to petitioner under sections 170, 2055, 2106, and 2522.

Petitioner's founding members had previously been local chapters of the American Cancer Society (hereinafter sometimes referred to as the ACS). These founding members separated from the ACS because (1) they wanted to participate in United Way fundraising campaigns, which ACS prohibited at that time; and (2) they wanted to concentrate on cancer prevention and alleviation of pain and suffering of cancer victims, rather than research to develop a cure for cancer.

---

[4] The related deficiency proceeding, docket No. 2009-91, involves deficiencies determined for 1986 and 1987. The parties have agreed to hold that case in abeyance until after the resolution of the instant case.

From 1963 until 1984, petitioner acted as a support organization for its "affiliate member agencies".  It published a quarterly newsletter, offered access to cancer educational materials, and held an annual meeting of its membership each fall.  Petitioner was an umbrella organization, coordinating its affiliate member agencies which met the direct needs of cancer patients through the providing of medical supplies, cancer research, and public education about cancer prevention, detection, and treatment.  Petitioner was supported primarily by the membership dues paid by its affiliate member agencies.  Petitioner also received contributions in small amounts as a result of direct solicitations of individuals who were members of petitioner's board of directors or of the boards of directors of petitioner's affiliate member agencies.  Until 1984, petitioner's annual budget never exceeded $50,000.

In 1983, some affiliate member agencies indicated they intended to withdraw from petitioner.  This precipitated a budget crisis for petitioner.  Its board of directors realized that petitioner might have to be dissolved unless other sources of funding could be secured for petitioner.  The board directed petitioner's executive director to conduct a search for a professional fundraiser that could assist petitioner in conducting fundraising to meet its increased need for funds, without the necessity of petitioner's contributing initial capital for the fundraising effort.

As a result, during 1983 and 1984, petitioner and W&H discussed their possible entry into a fundraising contract. As of March 12, 1984, petitioner estimated it would have an operating deficit for 1984 of $13,000, without additional fundraising income. In addition to providing the initial capital to conduct petitioner's direct mail fundraising campaign, W&H offered to furnish funds with which petitioner could continue to operate.

On June 11, 1984, petitioner and W&H entered into a "Full Service Direct Response Fundraising Agreement" (hereinafter sometimes referred to as the Contract) for a term ending May 30, 1989. As of the date the Contract was entered into, petitioner was on the verge of insolvency; petitioner did not have money to start a direct mail or other fundraising program on its own. The Contract was amended by an addendum on April 8-9, 1987. Unless the context indicates otherwise, references to the Contract are to be taken as including both the Contract entered into in 1984 and the 1987 amendment. The Contract expired in May 1989, and was not renewed.

In conjunction with the formation of the Contract, W&H agreed to advance money to petitioner in order to cover the initial costs of the mailings. W&H also agreed to give to petitioner an immediate advance, or "draw", against petitioner's projected future earnings from the Contract.

From 1984 until its bankruptcy in 1990, petitioner maintained its principal office in either Carmel or Indianapolis, Indiana. As part of the direct mail fundraising campaign petitioner conducted from 1984 through 1989 pursuant to the Contract, a Washington, D.C., office mailing address was maintained for petitioner. Contributors were directed to send their donations to the Washington, D.C., office mailing address.

During 1984 through 1989, about 79.6 million fundraising letters were mailed under the Contract. Of the 79.6 million letters, about 51.8 million were "prospect letters" and 27.8 million were "housefile letters". The terms "prospect letter" and "housefile letter" are discussed more fully infra. The Contract provided that W&H was to receive as compensation, among other things, mailing fees of $.05 per prospect letter mailed and $.10 per housefile letter mailed. However, the Contract was a "no-risk" contract for petitioner, in that petitioner was liable to pay fundraising expenses only to the extent proceeds were raised. If insufficient proceeds were raised to cover the fundraising expenses, then W&H was liable to pay the excess fundraising expenses. During the term of the Contract, W&H advanced funds to conduct petitioner's direct mail fundraising campaign and, generally, was paid its fees only after other fundraising expenses had been paid. Under the Contract, petitioner was further guaranteed that, for the first 2 years of

the Contract, petitioner would receive at least 50 percent of the cumulative net income produced from its housefile mailings; after the first 2 years, petitioner would receive at least 70 percent. In April 1986 petitioner agreed to keep the guarantee at 50 percent in exchange for W&H's reducing its "creative" package fee on housefile mailings and capping its mailing fee on any housefile mailing of more than 500,000.

Petitioner generally maintained its books under an accrual method of accounting. For 1984 through 1989, petitioner received the amounts of total annual contributions set forth in table 1.

Table 1

| Year | Total Contributions |
|------|---------------------|
| 1984 | $240,380 |
| 1985 | 5,087,453 |
| 1986 | 7,869,015 |
| 1987 | 10,740,045 |
| 1988 | 3,883,352 |
| 1989 | [1] 943,142 |
| Total | 28,763,387 |

[1] An analysis of petitioner's financial statements, prepared by petitioner's counsel and assumed to be true by petitioner's expert witness Richard S. Steinberg, indicates that $644,627 of the 1989 contributions were produced under the Contract.

For 1984 through 1989, petitioner incurred at least the amounts of total annual expenses in fundraising and in its mailing campaign set forth in table 2.

Table 2

| Year | Total Expenses |
|------|---------------:|
| 1984 | $241,251 |
| 1985 | 4,980,949 |
| 1986 | 7,255,744 |
| 1987 | 9,734,233 |
| 1988 | 3,229,425 |
| 1989 | 1,082,315 |
| Total | 26,523,917 |

The amounts in table 2 include mailing campaign expenses from petitioner's "Donor Development Fund" that petitioner concluded were allocable to its public education activities, as distinguished from its fundraising activities. The amounts in table 2 do not include other management and general expenses that petitioner incurred as a result of carrying out its fundraising activities and mailing campaign.

Petitioner received a total of about $2¼ million in net fundraising revenue under the Contract. In 1984 through 1989, petitioner paid to W&H the amounts for fundraising shown in table 3.

Table 3

| Year | Amounts Paid |
|------|-------------|
| 1984 | $43,965 |
| 1985 | 143,196 |
| 1986 | 842,219 |
| 1987 | 1,974,247 |
| 1988 | 999,527 |
| 1989 | 115,406 |
| Total | 4,118,560 |

The amounts in table 3 do not include list rental fees and commissions paid to Washington Lists, a division of W&H, or income derived by W&H from exploiting its rights in petitioner's housefile.

For 1984 through 1989, petitioner paid to Washington Lists the amounts for mailing list rentals shown in table 4.

Table 4

| Year | Amounts Paid |
|------|-------------|
| 1984 | $39,813 |
| 1985 | 907,594 |
| 1986 | 868,763 |
| 1987 | 1,756,964 |
| 1988 | 328,070 |
| Total | 3,901,204 |

After the end of the term of the Contract, petitioner entered into a fundraising contract with another fundraising consultant. Under this second contract, petitioner was liable for all fundraising expenses. However, when petitioner was not able to pay certain debts to vendors, the new fundraiser paid

those debts. The fundraising efforts conducted under the new contract were not successful, and petitioner suffered a substantial financial loss on the mailings done, and was unable to pay all of the fundraising expenses.

On November 2, 1990, respondent issued to petitioner a final notice of revocation of the favorable ruling letter retroactive to June 11, 1984. The notice of revocation states, in pertinent part, as follows:[5]

> We have completed our review of your activities, and examination of your Forms 990 for the years ending December 31, 1986 and December 31, 1987.
>
> By a determination letter dated March 31, 1969, we recognized your exemption from Federal Income tax under section 501(c)(3) * * *.
>
> As a result of the examination of your activities and financial records for the years noted above, we had unresolved questions concerning your mailings and your exempt status. On July 12, 1989, we requested technical advice from our National Office in order to resolve these questions.
>
> In response to the request for technical advice, our National Office ruled that your exemption from income tax should be revoked effective June 11, 1984.
>
>       *    *    *    *    *    *    *
>
> This letter constitutes formal notification of revocation of your exemption from Federal income tax effective June 11, 1984.
>
>       *    *    *    *    *    *    *

---

[5] There are some slight differences between the notice of revocation letter identified by both sides in the pleadings, and the one that the parties have stipulated in the administrative record; these differences appear to be irrelevant to any matter in dispute. In these findings we have used the letter that is in the administrative record.

Contributions to you are no longer deductible as provided in section 170 * * *  .

On November 2, 1990, respondent also issued a notice of deficiency to petitioner, determining income tax deficiencies for 1986 and 1987.

On January 30, 1991, after the bankruptcy court lifted the automatic stay, petitioner filed its petition initiating the instant declaratory judgment action pursuant to section 7428.  On January 30, 1991, petitioner also filed its petition initiating a proceeding for review of the notice of deficiency issued to it for 1986 and 1987, United Cancer Council, Inc. v. Commissioner, docket No. 2009-91.  The parties have agreed that the deficiency proceeding should be held in abeyance pending the resolution of the instant declaratory judgment action.

## Direct Mail Fundraising

W&H operated with the understanding that direct mail solicitation allows an organization's marketing and solicitation efforts to directly focus on and target specific individuals.  In W&H's view, in comparison to direct mail solicitation, solicitations conducted through the print media or radio will generally reach a nonspecific and less targeted audience.  W&H's advice to petitioner and actions under the Contract were based in part on these understandings.

In a direct mail fundraising campaign, a "prospect letter" is a letter mailed to an individual who has not previously

contributed, or otherwise responded, to the mailing organization. A "housefile letter" is a letter mailed to an individual who has contributed to the organization or has responded favorably to a communication, typically as the result of a prospect letter. An organization's housefile mailing is a mailing sent strictly to that organization's housefile.

An organization's housefile, containing the names, addresses, and other pertinent information with respect to that organization's previous contributors, can be a valuable asset in that organization's present and future fundraising efforts. Typically, in a direct mail fundraising campaign, practically all of an organization's net mailing revenue will be generated from its housefile mailings. As a result, a usual primary goal of a direct mail fundraising campaign is to develop a productive housefile of contributors for use in the organization's fundraising efforts.

In contrast to housefile mailings, an organization will usually lose money or, at best, break even in conducting prospect mailings. However, an organization typically first develops and establishes a productive housefile through conducting prospect mailings. Moreover, over the course of time, a housefile will suffer from attrition. Not all previous contributors will continue to contribute to the organization. As a result, even after an organization has built up a productive housefile, the organization will periodically conduct prospect mailings to

refresh and add new names to its housefile.

An organization's housefile can also be of considerable value to other organizations in their fundraising or solicitation efforts. Accordingly, an organization may be able to profit economically from its housefile by using its housefile to produce rental income or by exchanging its housefile for another organization's housefile, thereby reducing its fundraising expenses. Before the late 1970's there were few mailing lists on the market, and most that were available were exchanged list for list, rather than rented for a fee. By the late 1970's and early 1980's a rental market for mailing lists had developed. The rental market has expanded since the mid-1980's because there are more lists being made available for rent and more list rental brokers. However, some organization that have mailing lists did not rent or exchange their lists.

It is common practice to use monitoring or "dummy" names (sometimes called "seed names") in a housefile, to guard against unauthorized use of the housefile and to monitor the patterns of mail drops across the United States. Both petitioner and W&H maintained their own, separate, monitoring names with regard to the mailing lists developed under the Contract. The parties have not presented us with illustrations of how this dummy name monitoring works in practice, or how much effort or funds are expended in such monitoring programs generally, or were expended under the Contract.

By industry custom, if a rented name responds favorably to the mailing made by the lessee of the mailing list (i.e., by sending a contribution, making a purchase, or entering a sweepstakes contest), then the lessee is entitled to add that name to its own housefile. The lessee thereafter may use the name as its own and will not have to pay a further rental fee.

W&H had Wiland Associates (described infra as a services vendor) provide management information reports to petitioner. Among these reports was one that evaluated individual contributors on mailing lists, based on an analysis of the following three factors: (1) recency (i.e., how recently the last donation by that contributor was made), (2) frequency (i.e., how frequently that contributor has made donations to the organization), and (3) size of the gift. All other things being equal, a contributor who made a donation within the past 6 months is considered more valuable than a contributor who last made a donation 3 years ago. Similarly, all other things being equal, a contributor who made 10 donations is considered more valuable than a contributor who made just one donation. Lastly, all other things being equal, a contributor who made a $100 gift is considered more valuable than a contributor who made a $5 gift.

In the 1960's and the 1970's, the use of computers revolutionized the operation of the direct mail fundraising industry. Using the electronic data processing capability of computers, mailing lists could be analyzed, compiled, and

utilized much more efficiently than previously was possible. Before the use of computers, mailing lists were maintained on 3-by-5 cards or on metal plates.

Richard Viguerie (hereinafter sometimes referred to as Viguerie) was an early pioneer in the contemporary direct mail fundraising industry. By the late 1970's, Viguerie and his company, Richard Viguerie and Associates (hereinafter sometimes referred to as the Viguerie Company), had received considerable press and publicity as a result of their ability to successfully conduct direct mail fundraising campaigns for "conservative" political candidates and causes. The Viguerie Company reportedly had a master mailing list comprising the names and addresses of millions of contributors. The Viguerie Company also conducted nonpolitical direct mail fundraising campaigns for charitable organizations exempt under section 501(c)(3).

As of the early 1980's, Viguerie and the Viguerie Company, which maintained offices in the Washington, D.C., area, had several competitors who offered similar fundraising services. Some of these competitors were former employees of the Viguerie Company.

By the 1980's, many States enacted charitable solicitation statutes. Generally, such statutes require most charitable organizations to register with a State governmental regulatory agency before soliciting contributions from members of the general public within that State. Some State charitable

solicitation statutes further prohibited or restricted charitable organizations from soliciting contributions, unless a prescribed minimum percentage of the proceeds raised would be expended in the charitable organization's charitable program, thereby limiting the percentage of the proceeds to be used by the charitable organization to pay fundraising expenses.[6]

The Council of Better Business Bureaus (hereinafter sometimes referred to as the CBBB) and the National Charities Information Bureau (hereinafter sometimes referred to as the NCIB) established certain guidelines for organizations that solicit charitable contributions from the public. The objectives of the CBBB as to these matters are to (1) encourage self-regulation of charities and (2) assist potential donors by helping them to make better-informed gift-giving decisions. The objective of the NCIB is to promote informed giving by providing to the public information that will help potential donors to evaluate charities. The CBBB is exempt under section 501(c)(6) as a business league; its activities in the charitable area are conducted by a division called the Philanthropic Advisory

---

[6] Ultimately, the United States Supreme Court held unconstitutional, on First Amendment grounds, several State charitable solicitation statutes that limited the amount or percentage of the proceeds raised that could be expended by charitable organizations to pay fundraising expenses. See Riley v. National Federation of Blind, 487 U.S. 781 (1988); Secretary of State of Md. v. J.H. Munson Co., 467 U.S. 947 (1984); Schaumburg v. Citizens for Better Environ., 444 U.S. 620 (1980); see also, United Cancer Council, Inc. v. Commissioner, 100 T.C. at 174-177.

Service.  The CBBB and the Philanthropic Advisory Service were formed in 1971, as the successors to the National Better Business Bureau and its Solicitations Control Division, respectively.  The NCIB is exempt under section 501(c)(3) as a charity; it was founded in 1918.  CBBB and NCIB also prepared and issued reports on whether particular charitable organizations met CBBB's and NCIB's respective fundraising and operational guidelines. Typically, a report on a particular charitable organization was prepared as a result of CBBB's or NCIB's receipt of inquiries with respect to that charitable organization.

Among its guidelines, CBBB generally recommends that (1) a charitable organization's fundraising costs not exceed 35 percent of related contributions, and (2) total fundraising and administrative expenses not exceed 50 percent of its total income.  However, CBBB recognizes that a charitable organization that does not meet these percentage limitations may provide evidence demonstrating that its use of funds is reasonable.  In particular the CBBB pamphlet on standards states as follows:

> The higher fundraising and administrative costs of a newly created organization, donor restrictions on the use of funds, exceptional bequests, a stigma associated with a cause, and environmental or political events beyond an organization's control are among the factors which may result in costs that are reasonable although they do not meet these percentage limitations.

The overwhelming majority of the charities that the CBBB reviews meet all 22 of the CBBB's guidelines.

Similarly, among its guidelines, NCIB generally recommends

that not more than 30 percent of the contributions, grants, and bequests a charitable organization receives should be spent on fundraising. NCIB suggests that, where more than 30 percent was spent on fundraising, then the prospective contributor should further analyze the charitable organization's operations and ask the charitable organization for an explanation regarding the percentage of proceeds spent in fundraising. In particular, NCIB's contributor's checklist pamphlet states as follows:

> Some fund-raising practices are always expensive--
> acquisition of new donors through direct mail or
> telemarketing, for example--and yet they may be the
> only methods available to an organization if it hopes
> to reach the general public. Some charities which rely
> heavily on bequests will have fundraising costs that
> vary considerably from year to year. New
> organizations, organizations with causes that are
> little known or controversial, organizations with a
> contributor base made up of many smaller contributions
> rather than a few large grants--are all likely to have
> relatively high fund-raising costs, and yet they may be
> quite well managed.

### W&H; AICR

W&H began business in late 1981 as a two-person partnership owned 50 percent each by Jerry Carroll Watson (hereinafter sometimes referred to as Watson) and Byron Chatworth Hughey (hereinafter sometimes referred to as Hughey). As of the time of the trial in the instant case, Watson and Hughey have been W&H's only two partners. Before forming W&H, Hughey was employed at the Viguerie Company from 1978 to 1981. From 1983 through the time of the trial in the instant case, W&H maintained its offices in the Washington, D.C., area, in Alexandria, Virginia. (In July

1992, W&H changed its name to Direct Response Consulting Services; herein we continue to refer to it as W&H.)

W&H is engaged in the direct mail and fundraising services business and has had up to about 20 to 22 employees. Its clients primarily have been nonprofit organizations. Over the years, W&H began to specialize in offering direct mail fundraising services to nonprofit health organizations. In 1984, W&H had one or two clients in addition to petitioner which were nonprofit health organizations. Over the years, more and more of W&H's clients were in health-related areas. In 1987, W&H received 65 percent of its income from three major clients and petitioner accounted for 26 percent of W&H's gross income for that year. In 1987, W&H had a total of 12 clients.

American Institute For Cancer Research (hereinafter sometimes referred to as AICR), which has been recognized by respondent as tax-exempt under section 501(c)(3) since its incorporation in September 1981, was one of W&H's first nonprofit health clients. Watson and Hughey are the two sole "founding members" of AICR. AICR's articles of incorporation provide that only its founding members have the right to vote. The articles also provide that no changes may be made with respect to the founding members who were designated at AICR's initial board meeting and that no other founding members may be added, unless all the founding members are dead.

AICR and W&H entered into successive fundraising contracts

that covered the period from AICR's inception through December 31, 1989.[7]  When W&H did its first mailings for AICR, Watson and Hughey consulted an attorney.  The attorney advised them that they and AICR would have to be careful that section 501(c)(3)'s prohibition against inurement was not violated, in light of Watson's and Hughey's status as founding members of AICR.  As a result, W&H reduced its fees "drastically", W&H relinquished all ownership in AICR's mailing lists, and other changes were made. Table 5 summarizes certain features of W&H's fundraising contracts with AICR.

---

[7]     Petitioner does not object to respondent's proposed finding of fact to this effect.  We note that the first of the contracts that respondent listed in support of this finding was executed on Jan. 20, 1983; this contract states that it "is effective the 1st day of June 1982"; but AICR had been incorporated in September 1981.  Similarly, the last of the contracts that respondent listed states that "The term of this Agreement is two (2) years beginning Jan. 1, 1987"; thus, the last contract appears to have expired 1 year before the date specified in the agreed-to proposed finding.  We have treated the agreed-to proposed finding as, in effect, an additional stipulation between the parties.

Table 5

| Effective Date of Contract | No-Risk Provision | Term of Contract | Mailing Fees | | Retainer[1] | List Ownership |
|---|---|---|---|---|---|---|
| | | | Prospect--cents per letter, letter per year | Housefile--cents per letter, letters per mailing | | |
| 6/1/82 | Yes | 1 yr. | 4 cents | 8 cents | $3,000/mo. | Capital List-- forever |
| 2/4/83 | Yes | 1 yr. | 4 cents | 8 cents | 1,500/mo. | Joint--W&H, AICR |
| 2/4/83[2] | No | 1 yr. | 2 cents | 4 cents 1st 250,000 2 cents thereafter | 1,500/mo. | Sole property of AICR |
| 1/1/84 | No | 1 yr. | 2 cents 1st 10 mil. 1 cent next 5 mil. 0.5 cents next 3 mil. Free after 18 mil. | 4 cents 1st 250,000 1 cent next 250,000 Free after 500,000 | 1,500/mo. | Sole property of AICR |
| 1/1/85 | No | 1 yr. | 1.8 cents 1st 10 mil. 0.9 cents next 5 mil. 0.45 cents next 3 mil. Free after 18 mil. | 3 cents 1st 250,000 1 cent next 250,000 Free after 500,000 | No | Sole property of AICR |
| 1/1/86 | No | 1 yr. | 1.8 cents 1st 10 mil. 0.9 cent next 5 mil. 0.45 cents next 9 mil. Add'l. letters--price to be arranged | 3 cents 1st 250,000 1 cent next 250,000 Free after 500,000 | No | Sole property of AICR |
| 1/1/87 | No | 2 yrs. | 1.8 cents 1st 10 mil. 0.9 cent next 5 mil. 0.45 cents next 9 mil. Add'l. letters--price to be arranged | 3 cents 1st 400,000 1 cent next 400,000 | No | Sole property of AICR |

[1]  Payment to be applied to AICR's debt to W&H, not a separate "package fee".

[2]  Contract signed Aug. 10, 1983, retroactive to Feb. 4, 1983.

Later, as a result of advice by another attorney, changes were made regarding Watson's and Hughey's control over AICR. Under AICR's original articles of incorporation, directors are elected by, and may be removed without cause by, AICR's founding members, Watson and Hughey. Under amendments filed May 4, 1984, any founding member is forbidden to elect or remove directors "during any period in which such founding member has a commercial relationship with the Corporation [AICR] and for a period of three years thereafter." For these purposes "the term `founding member' shall be deemed to include any * * * partnership * * * in which a founding member has a material interest." These amendments also provide as follows:

> During any period that all founding members are prohibited, or are abstaining, from exercising their rights with respect to the election and removal of Directors, Directors shall be elected and removed by the affirmative vote of a majority of the entire Board of Directors.

### The Contract; Related Agreements

A. The Contract (June 11, 1984)

The Contract provides that, during its 5-year term, ending May 30, 1989, W&H would be petitioner's exclusive fundraising consultant and adviser in petitioner's conduct of its direct mail fundraising solicitations. Petitioner agrees not to "retain or use the services of any other person or company to provide counsel and advice to [petitioner] in conducting its direct mail solicitations." W&H agrees to furnish its services and to advise,

counsel, and make recommendations concerning all aspects of preparing petitioner's direct mail fundraising and membership solicitations, and to be responsible for implementing all of the work required, either directly or through affiliates or other suppliers, "subject to the approval of CLIENT [petitioner]."  W&H further agrees to maintain petitioner's housefile and to perform all follow-up correspondence.

The Contract further provides that all mailing campaign materials prepared and recommended by W&H, including the proposed numbers of letters to be mailed, would be subject to petitioner's approval "and no such material shall be mailed or made available to the public without such approval."

The Contract additionally provides that a bank or "caging company" (described below) would be hired to act as cashier and escrow agent for the funds generated under the Contract.  The bank or caging company would process receipts and disburse payments under an agreement to be entered into by it, petitioner, and W&H.

The Contract requires W&H to promptly furnish to petitioner copies of invoices received from suppliers of goods and services used in fulfilling W&H's obligations under the Contract.  The Contract also requires W&H to make reasonable efforts, where market conditions and time permit, to obtain competitive bids or rates for work subcontracted to suppliers.  W&H affiliates would be allowed to perform such subcontract work, subject to this competitive bid and rate requirement.  No markup was to be added

by W&H on the supplier or subcontractor invoices billed to petitioner.

The Contract provides that W&H would be paid, as compensation for its services, mailing fees of $.05 per prospect letter mailed and $.10 per housefile letter mailed, as well as certain creative fees for each housefile mailing package mailed. On a housefile package mailed to under 50,000 previous contributors, W&H would be entitled to a $2,500 creative fee. On a housefile package mailed to 50,000 or more previous contributors, W&H's creative fee would be $5,000. Petitioner would pay a retainer of $1,500 per month to W&H as a draw against these fees. During the term of the Contract, all materials, packages, and ideas developed by W&H on behalf of petitioner would remain the sole property of W&H, and all such material could be used by petitioner only with W&H's written consent.

With respect to petitioner's mailing list, the Contract provides that W&H and petitioner would have respective co-ownership rights as follows:

> Section 14. <u>List Ownership</u>. It is expressly understood, covenanted and agreed upon  * * *  that any and all names and addresses and amounts contributed, if any, of persons, firms, associations or corporations which are obtained, developed, compiled or otherwise acquired for CLIENT by or through the direct or indirect efforts of W&H in connection with any services rendered by W&H to CLIENT pursuant to the terms hereof shall at all times be and constitute the property solely and exclusively of W&H and CLIENT. These names and addresses and the amounts of contributions, if any, can be used at any time by CLIENT in any manner, for any purpose for its own account. CLIENT shall use these

names and addresses developed by W&H for no purpose other than in direct connection with CLIENT'S own projects. CLIENT shall not at any time during the life of this Agreement or any time thereafter rent, exchange, lease, sell or give away these names and addresses developed as the result of the efforts of W&H to any other parties for any purpose whatsoever. However, W&H shall be free to use the names and addresses referred to in Section 14 in any way it so desires and for any purpose it may so determine.

The Contract also states that "It is expressly understood and agreed upon that * * * Section 14 [the list ownership rights provision] shall survive" the termination of the Contract. The Contract also requires that, during the Contract's term, any computer work that petitioner wants to have done with respect to the names developed as a result of the Contract "must be done at W&H or at a company designated by W&H."

The Contract provides as follows with respect to its "no-risk" nature:

> Section 9. <u>Payments to W&H and Suppliers</u>. W&H assumes full obligation and responsibility for the payment of all vendor, suppliers and W&H invoices arising out of the fulfillment of W&H's obligations hereunder, said invoices to be subsequently reimbursed by CLIENT only under the terms and conditions set forth in this Section. CLIENT shall reimburse W&H only to the extent that W&H has raised such funds. W&H shall have no right or claim upon any other funds or accounts of CLIENT. W&H shall be reimbursed for money owed to it only out of funds obtained as a result of W&H's efforts. However, if CLIENT raises additional funds through their own efforts from names that W&H has generated, these funds shall be considered in the same category as funds raised by W&H. People who are members of UCC or prior donors to UCC are excluded from the provisions of this section. In other words, W&H is liable for all expenses connected with this contract to the extent that W&H has not raised funds to cover those costs. This section applies throughout this agreement.

CLIENT shall make monthly payments to W&H to the full extent that W&H has raised funds to pay the costs incurred by W&H in carrying out its obligations under this Agreement.

For the first two years of this Agreement, up to 50% of net income from * * * [house] file mailings may be applied to the cost of * * * [prospect] mailings. After two years and for the remainder of this Agreement, up to 30% of net income from * * * [house] file mailings may be applied to the cost of * * * [prospect] mailings. CLIENT will only utilize * * * [house] file net income for its projects under the terms and conditions set forth in this Section.

For purposes hereof, net income received pursuant to this Agreement by CLIENT shall hereby be defined as all contributions received, less all expenses incurred, pursuant to the terms hereof, including supplier invoices, postage, W&H charges and all other items described in this Agreement.

The Contract provides that it "is automatically renewable for Five (5) Years if either Party does not in writing specify the canceling of this Agreement at least Three (3) Months prior to the expiration of this Agreement." Apparently this provision was intended to give each party to the Contract a veto over the Contract's automatic renewal. However the Contract does not include a provision permitting termination for cause.

B.  The Escrow Agreement

On June 19, 1984, petitioner, W&H, and Washington Intelligence Bureau (hereinafter sometimes referred to as WIB) entered into an escrow agreement (hereinafter sometime referred to as the Escrow Agreement), whereby WIB would provide escrow services in connection with the Contract. The Escrow Agreement, which W&H provided to petitioner and WIB, is essentially the same

agreement that W&H uses in all of the escrow arrangements that W&H has with WIB.  During the term of the Contract, WIB was at all times the escrow agent and did most of the caging.[8]

WIB began to deal with W&H in 1982 or 1983.  WIB has been the escrow agent for most of W&H's clients.  WIB's first W&H-related client was AICR.  In 1984, about 15-20 percent of WIB's business pertained to W&H's clients.  By 1989, this had grown to 30-35 percent.  Thereafter, the percentage dropped to about 25 percent. WIB has always been unrelated to W&H in ownership.

The Escrow Agreement provides, in pertinent part, as follows:

> WHEREAS, the Client [petitioner] agrees to pay all costs for direct mail fund raising services as well as cost for others providing services and supplies for the direct mail fund raising program.
>
> IT IS, THEREFORE, agreed:
>
> 1.   ESCROW FUND.  The Agency [W&H] and the Client hereby agree that returns from the direct mail fund raising programs shall be received by the Escrowee [WIB] and the sum so received shall be known as the Escrow Fund.
>
> 2.   PAYMENT OF CREDITORS.  The Escrow Fund shall be held by The Escrowee separate and apart from the other funds of the Escrowee.  The Agency shall present the Escrowee with invoices of creditors, including invoices of the Escrowee, which the Escrowee shall pay from said Escrow Fund.  All invoices paid from said Escrow Fund shall be

_____

[8]   Caging involves receiving, opening, and processing the return mail generated by a direct mail campaign.  A caging company generally performs such functions as depositing the return mail receipts with a bank, providing to the client an account of these receipts, verifying and correcting name and address information with respect to contributors, recording pertinent information with respect to contributors, and relaying such contributor information to a computer company selected by the client.

approved by the Agency and submitted to the Escrowee promptly for payment.

3. MAIL CHARGES. The Escrowee may transfer all sums necessary to pay charges by the United States Postal Service for the Client's Business Reply Mail without approval of the Agency or Client.[9]

4. ESCROWEE'S COMPENSATION. The compensation of the Escrowee shall be established by the Agency, the Client, and Escrowee. The Escrowee shall render billings for Escrowee services to the Client, in care of the Agency, and shall be paid on a priority basis. If approved invoice is not received from the Agency by the Escrowee within 30 days from the date of invoice, the Escrowee shall be authorized to pay such billing without the approval of the Agency.

* * * * * * *

6. ACCOUNTING. The Escrowee shall provide the Client and Agency an accounting as to each payment or disbursement made from the Escrow Fund. Those disbursements shall only be upon the written approval of the Agency. The Escrowee shall be provided compensation for these services.

7. DISPUTES. In the event of any dispute with respect to disposition of all or part of the Escrow Fund, The Escrowee shall not be obligated to disburse the disputed portion thereof nor shall the Escrowee be required affirmatively to commence any action against the Client or Agency, or defend any action that a creditor might bring. In his [sic] sole discretion, the Escrowee may, in the event of a dispute as to the disposition of all or part of the Escrow Fund, commence an action in the nature of interpleader and seek to deposit the disputed portion in a Court of Competent Jurisdiction.

---

[9] The Business Reply Mail postage referred to represented postage on the return mailing envelopes provided to the persons solicited in the direct mail fundraising campaign for purposes of making contributions to petitioner or otherwise responding. Unlike the outgoing fundraising letters and materials which were mailed under petitioner's nonprofit mail permits at the lower nonprofit mailing rate, postage at the regular United States Postal Service rate was required on the return letters mailed by recipients of the fundraising letters.

Pursuant to the Escrow Agreement, WIB opened a bank account (hereinafter sometimes referred to as the Escrow Account) in which to maintain the escrow fund.  Only authorized employees of WIB could withdraw funds from the Escrow Account.  The money deposited into the Escrow Account came primarily from the following sources: (1) The money W&H advanced to pay for petitioner's fundraising expenses and operational expenses, and (2) the contributions made by the general public in response to the fundraising letters mailed under the Contract.  All of the revenues from petitioner's direct mail campaign, not merely the profits from the mailings, went into the Escrow Account.

C. Petitioner's "Draw" Arrangement

As indicated above, during its discussions with petitioner about entering a possible fundraising contract, W&H offered to provide funds with which petitioner could continue to operate. W&H furnished such funds to petitioner after the Contract was executed.

A December 17, 1984, letter agreement between petitioner and W&H provides, in pertinent part, as follows:

> In order to meet your cash flow needs for administration and program, you [petitioner] plan to transfer funds from the escrow account that were generated from * * *  [prospect letter mailings].  To date $5,000 was transferred on November 1, $5,000 was transferred on December 1, and you plan to transfer another $5,000 on January 1, 1985.

> This letter acknowledges the fact that these transfers * * *  are made in such a manner from  * * *  [prospect letter mailing] revenues will be replenished from UCC's income from * * *  [housefile letter] mailings within six months of

making such a transfer.

Contrary to what is suggested in the above letter agreement, as of December 1984, no net mailing revenues had yet been produced from either the prospect letter mailings or housefile letter mailings conducted. Only losses or relatively small amounts of net mailing revenues were produced by the housefile letter mailings up until June or July 1985. It was not until about July 1985, that the cumulative net revenue produced from housefile letter mailings began to somewhat approach the cumulative amount of funds W&H provided to meet petitioner's operating expenses. Initially, some of the funds used to meet petitioner's operating expenses were advanced by W&H to the Escrow Account. Also, W&H deferred receiving payment of its fees.

Later, as the net revenue produced from mailings began to increase, W&H authorized and permitted petitioner to "draw" increasingly larger monthly amounts of funds from the Escrow Account to finance petitioner's larger annual operating budgets. Up until about the execution on April 8-9, 1987, of an addendum to the Contract, petitioner was fully liable to repay the draws it had taken, to the extent the draws exceeded the 50 percent of cumulative housefile income guaranteed to petitioner under the Contract. The draws petitioner received were to be repaid within 6 months, regardless of the direct mailing campaign's profitability. The events leading up to and culminating in the execution of the April 1987 addendum to the Contract are discussed

more fully *infra*.

Once the mailings had become sufficiently more profitable, in deciding the amount of petitioner's monthly draws, W&H considered petitioner's budget plans and the future net mailing revenues expected to be produced.  W&H based its decisions, in large part, on its calculation of the current monthly net housefile mailing revenue being produced and the 50 percent of the cumulative housefile income that petitioner, in all events, was guaranteed under the Contract.

Monthly draws from the Escrow Account were taken by petitioner over the period from October 1984 through May 1989, as shown in table 6.

Table 6

| Month | Monthly Draws | Cumulative Draws |
|-------|---------------|------------------|
| 10/84 | $5,000 | $5,000 |
| 11/84 | -- | 5,000 |
| 12/84 | 5,000 | 10,000 |
| 1/85 | 10,000 | 20,000 |
| 2/85 | -- | 20,000 |
| 3/85 | 6,000 | 26,000 |
| 4/85 | 14,000 | 40,000 |
| 5/85 | 10,000 | 50,000 |
| 6/85 | 10,000 | 60,000 |
| 7/85 | 18,000 | 78,000 |
| 8/85 | 20,000 | 98,000 |
| 9/85 | -- | 98,000 |
| 10/85 | 22,000 | 120,000 |
| 11/85 | 33,000 | 153,000 |
| 12/85 | 25,000 | 178,000 |
| 1/86 | 40,000 | 218,000 |
| 2/86 | 40,000 | 258,000 |
| 3/86 | 40,000 | 298,000 |

(Cont.) Table 6

| Month | Monthly Draws | Cumulative Draws |
|---|---|---|
| 4/86 | 40,000 | 338,000 |
| 5/86 | 40,000 | 378,000 |
| 6/86 | 40,000 | 418,000 |
| 7/86 | 40,000 | [1]453,000 |
| 8/86 | 40,000 | 493,000 |
| 9/86 | 40,000 | 533,000 |
| 10/86 | 40,000 | 573,000 |
| 11/86 | 40,000 | 613,000 |
| 12/86 | 40,000 | 653,000 |
| 1/87 | 50,000 | 703,000 |
| 2/87 | 50,000 | 753,000 |
| 3/87 | 50,000 | 803,000 |
| 4/87 | 50,000 | 853,000 |
| 5/87 | 50,000 | 903,000 |
| 6/87 | 50,000 | 953,000 |
| 7/87 | 50,000 | 1,003,000 |
| 8/87 | 50,000 | 1,053,000 |
| 9/87 | 50,000 | 1,103,000 |
| 10/87 | 50,000 | 1,153,000 |
| 11/87 | 50,000 | 1,203,000 |
| 12/87 | 50,000 | 1,253,000 |
| 1/88 | 60,000 | 1,313,000 |
| 2/88 | 60,000 | 1,373,000 |
| 3/88 | 60,000 | 1,433,000 |
| 4/88 | 60,000 | 1,493,000 |
| 5/88 | 60,000 | 1,553,000 |
| 6/88 | 60,000 | 1,613,000 |
| 7/88 | 60,000 | 1,673,000 |
| 8/88 | 60,000 | 1,733,000 |
| 9/88 | 60,000 | 1,793,000 |
| 10/88 | 60,000 | 1,853,000 |
| 11/88 | 60,000 | 1,913,000 |
| 12/88 | 60,000 | 1,973,000 |
| 1/89 | 60,000 | 2,033,000 |
| 2/89 | 60,000 | 2,093,000 |
| 3/89 | 60,000 | 2,153,000 |
| 4/89 | 60,000 | 2,213,000 |

[1] So shown in the stipulated exhibit.  Evidently, there is a $5,000 error in either the July 1986 monthly draw amount or the cumulative draws.  This discrepancy does not affect our analysis or conclusions.

D. Agreement to Continue at 50 Percent the Percentage
   of Net Housefile Mailing Income the Fundraising
   Contract Required to be Retained in the Escrow
   Account to Reimburse W&H

As indicated above, the Contract originally provided that, after 2 years, the percentage of net housefile mailing income that petitioner was required to retain in the Escrow Account be lowered from 50 percent to 30 percent.  In March and April 1986, Watson proposed to petitioner that this percentage remain at 50 percent, rather than be lowered, because of higher prospect mailing expenses resulting from an increase in postal rates.  In exchange for petitioner's agreement to this, W&H would reduce its creative fee on housefile package mailings from $5,000 to $2,500 and cap its mailing fee at $50,000 for any housefile mailing done in excess of 500,000 letters.  On April 26, 1986, petitioner's board of directors accepted Watson's proposal.

E. April 1987 Addendum to the Contract

The certified public accounting firm that examined petitioner's annual financial statements issued a qualified opinion, dated April 18, 1986, as to petitioner's 1985 financial statement.  The certified public accounting firm elaborated on its concerns in a management letter dated May 23, 1986, to the executive committee of petitioner's board of directors.  This management letter states, in pertinent part, as follows:

General Fund

1. Continued Existence of the Agency [petitioner].
   Our gravest concern is the viability of the

organization.  It is our understanding that the 1986 budget totals $520,000 including grant commitments of $100,000.  You expect to fund this ambitious budget with the excess of revenues over expenses from the direct-mail campaign.  What will the Council [petitioner] do if the excess of revenues over expenses does not materialize at the level expected?

The General Fund must borrow heavily from the Donor Development Fund [Escrow Account] to finance the budget, and if required to repay such borrowings it is doubtful the General Fund would have the ability to make the repayments.

Over a 7- to 8-month period beginning in or about July 1986, petitioner discussed with W&H its concerns regarding petitioner's full recourse liability to repay the excess draws taken and petitioner's inability to receive unqualified opinions from the certified public accounting firm with respect to petitioner's future annual financial statements.  On October 23, 1986, Watson sent a letter to petitioner's executive director stating W&H's position with respect to petitioner's repayment of the excess draw liability, stating in pertinent part, as follows:

This letter is to confirm our discussion relating to program draws from the UCC escrow account.

*  *  *  *  *  *  *

As we understand it, UCC's concerns surround the procedure by which this [50 percent of] net income [from housefile mailings] is transferred to your regular operating account.

Rather than receiving the exact amount as determined by the 50% formula, UCC, with W&Hs knowledge, is taking a fixed amount each month.  When the final net income figure becomes known some months later, UCCs draw from the escrow account can be greater than it should be.

Your question is Will UCC be required to pay the escrow account back for this excess draw?

According to the terms of the agreement, I suppose that technically you would have to do this.

However, since W&H does have knowledge that these transfers are taking place, we currently have no objection to this in light of our hope that we can overcome the deficits. W&H would not request UCC to repay any overdraws unless we objected to a specific draw at the time it was taken or in the event that UCC would unreasonably interfere with W&H's efforts to continue the mailing campaign to recover the deficits.

The worst thing that could happen is that should the deficits continue to grow or can not be reduced, and if UCC substantially overdraws its 50% program allocation, it could become necessary to reduce the draws to bring them back into balance.

Should we determine this situation to be developing, I would like for us to sit down well in advance of such time and create plans so that a reduction would not adversely impact UCC's operation.

After reviewing Watson's October 23, 1986, letter, petitioner's executive committee and executive director concluded that the letter was not satisfactory for petitioner's purposes and did not relieve petitioner from having full recourse liability with respect to excess draws.

Petitioner's executive committee asked petitioner's executive director "to contact * * * Watson to ask that he rewrite it [i.e., the October 23, 1986, letter] in time for our auditors review."

Watson sent a new letter to petitioner's executive director on November 19, 1986. The November 19, 1986, letter is substantially the same as the October 23, 1986, letter, except as

follows: (1) The November 19 letter omits the October 23, 1986, paragraph that states "According to the terms of the agreement, I suppose that technically you would have to do this [i.e., repay the excess draw]"; and (2) the November 19 letter replaces the phrase "the draws" by the phrase "future draws" after "reduce" in the October 23 letter clause "it could become necessary to reduce the draws to bring them back into balance."

On December 12, 1986, petitioners executive director sent a letter to Watson about the treatment of general and administrative costs under the Contract. In the course of this letter, he pointed out that the auditors "were in the office to begin preliminary work on the 1986 Financial Statements."

Petitioner and W&H executed an addendum to the Contract on April 8-9, 1987. The addendum provides that, beginning with 1986, petitioner would not have to repay draws taken in excess of its 50 percent of its housefile income, to the extent sufficient net fundraising revenue was not raised. The addendum states that such excess draws would be treated in the same manner as prospect mailing debts for purposes of the Contract. The addendum further provides that petitioner's monthly draws would be agreed to in writing by W&H and petitioner, and requires W&H to give 90 days' prior written notice to petitioner in order to effectuate any reduction in the monthly draws. Petitioner's then-chairman believed that W&H agreed to the April 1987 addendum--especially the nonrefundability of the draws--because W&H hoped that it

would improve relations with petitioner's board of directors and increase the likelihood that the Contract would be renewed.

As a result of the addendum provision regarding monthly draws, petitioner received an unqualified opinion for 1986. That is, the certified public accounting firm's report no longer included qualifications or reservations about petitioner's practices or potential liabilities.

### Direct Mail Fundraising Campaign: 1984-1989

A. In General

From June 1984 through May 1989, W&H conducted a nationwide direct mail fundraising campaign for petitioner. Mailings were eventually sent throughout all 50 States. However, petitioner directed W&H not to make mailings to areas serviced by certain of petitioner's member agencies, as those member agencies received annual funding from the United Way campaign and a condition of their receipt of such funding was that they not be involved in competing fundraising efforts.

W&H created and developed direct mail fundraising packages with petitioner's assistance and input. Before each direct mail package was mailed, petitioner received from W&H all materials to be included in the package, as well as the names of all mailing lists to which W&H proposed to send the package and the estimated numbers of names from each mailing list to be used in the mailing. Petitioner, through its staff and a committee of its board, reviewed and revised the package and the mailing list and

gave instructions as to the mailing list numbers, the copy, the dates of mailing, and the total number of letters to be sent.

Petitioner received from W&H a monthly status report of the cumulative costs and revenues of each direct mail package mailing and a proposed schedule of future mailings. Petitioner was also advised with regard to test mailings, typically of 5,000 letters, that W&H had done of proposed mailing packages. If a test mailing was successful, then W&H generally recommended that more mailings of that package be "rolled out" in greater quantities.

W&H issued purchase orders on behalf of petitioner with respect to all of the goods, services, and other expenditures required for the various mailings. This was done on an on-going basis and involved such items as computer work, mailing house expenses, mailing list rentals, and printing. When petitioner approved the making of a mailing, W&H and petitioner considered petitioner to have authorized W&H to order and arrange for all of the related goods, services, and other expenditures required to effectuate the mailing.

Petitioner accrued the amounts shown in table 7 as its expenses for (1) postage and shipping, (2) printing and publishing, (3) fundraising fees,[10] and (4) mailing list rentals.

---

[10] Compare the accruals shown on the fundraising fees column in table 7, with the payments shown supra table 3. When adjusted for the W&H reimbursements pursuant to the Contract, the net accrual amounts are fairly close to the actual payment amounts, except for 1986, where the difference is about $275,000.

(continued...)

Petitioner allocated about 45 percent of each of these categories of expenditures--other than fundraising fees--to "program services", rather than "donor development and fundraising".

---

[10](...continued)

Table 7

| Year | Postage and Shipping | Printing and Publications | Professional Fundraising Fees | (Reimbursable) or Not Reimbursable[1] | Net Professional Fundraising Fees | Mailing List Rentals |
|---|---|---|---|---|---|---|
| 1984 | $60,171 | $74,224 | $30,092 | -- | $30,092 | $50,201 |
| 1985 | 1,480,719 | 1,445,431 | 798,092 | $(641,920) | 156,172 | 1,034,711 |
| 1986 | 2,079,059 | 1,513,599 | 1,521,101 | (403,772) | 1,117,329 | 1,133,254 |
| 1987 | 2,678,137 | 1,824,517 | 1,259,798 | 730,228 | 1,990,026 | 1,475,299 |
| 1988 | 936,627 | 675,605 | 659,179 | 237,444 | 896,623 | 229,684 |
| 1889 | 263,514 | 439,479 | 115,406 | 65,890 | 181,296 | 14,529 |
| Totals | 7,498,227 | 5,972,855 | 4,383,668 | (12,130) | 4,371,538 | 3,937,678 |

[1] Expenses (reimbursable), or no longer reimbursable, by W&H under the Contract. The amounts are taken from petitioner's Forms 990. The parties have not explained why these amounts net to ($12,130), rather than -0-.

B. <u>W&H's Advances of the Initial Capital to</u>
   <u>Conduct the Direct Mail Fundraising Campaign</u>

As indicated above, the Contract was a "no-risk" contract with respect to petitioner's payment of fundraising expenses.

For the first 2 years or so under the Contract, W&H advanced money to the Escrow Account to pay for postage. Postage was an "upfront" expense, while other expenses generally were billed "after the fact", when petitioner had already received the revenue generated by the mailing. For a while, W&H continued to advance money to pay for postage even when there were substantial amounts in the Escrow Account. W&H did this because its people believed that there was not enough money in the Escrow Account to pay both the postage and the other vendors, and because of the draws that W&H paid to petitioner.

W&H's last advance of funds to petitioner for postage occurred on March 9, 1987. Thereafter, petitioner earned sufficient profits from its mailings to cover its postage expense.

The Contract does not specify how much capital W&H would provide to fund petitioner's direct mail fundraising campaign. W&H's decisions to advance additional capital were based, in substantial part, on its evaluation of the results from the mailings that had already been done and on its conclusions about the mailing campaign's profits prospects. Where W&H and its clients entered into no-risk fundraising contracts similar to the

Contract, W&H's practice was to stop advancing funds to finance a client's direct mail fundraising campaign if the initial mailings were unsuccessful and W&H concluded that reasonable prospects for conducting a profitable mailing campaign did not exist. If W&H decided to stop advancing funds, W&H then advised that client its mailings would be curtailed, unless that client paid the expenses of the further mailings that the client wanted to do. On the other hand, if W&H concluded that strong prospects for conducting a profitable mailing campaign existed, W&H then might substantially increase its advancements of funds in order to finance larger mailings for that client.

In this manner W&H effectively limited the risk that it had apparently assumed in any no-risk fundraising contracts similar to the Contract

C. Vendors Who Furnished Goods or Services

In the course of petitioner's direct mail fundraising campaign, goods and services were obtained from a number of vendors. As indicated above, WIB was the escrow agent and provided most of the caging services with respect to the return mail received in response to petitioner's mailings. Wiland Associates (hereinafter sometimes referred to as Wiland) was retained by W&H and performed the computer services required in connection with the Contract.

Several other vendors at various times furnished goods or services in connection with petitioner's direct mail campaign.

W&H did not own or have any interest in the vendors who furnished printing, mailing, telemarketing, or data processing services under the Contract, nor did W&H own or have any interest in WIB or Wiland.

The Art Department Company, a corporation owned by Watson and Hughey, prepared mock-ups and layouts and performed other art work-related services for W&H's clients and for other customers. Petitioner was billed at the rate of $25 per hour for the Art Department Company services.

Washington Lists, a division of W&H, performed list brokerage services for petitioner.[11]  A list broker represents an organization that wants to rent a mailing list from another organization.  One of Washington Lists' functions as a list broker was to arrange for petitioner to use as lessee certain mailing lists.  Washington Lists arranged these mailing list rental transactions for petitioner through standard industry channels for such transactions.

D. Rentals of Mailing Lists

As indicated above, Wiland was retained by W&H to perform the computer services required in connection with the Contract, including maintenance of a computer list of petitioner's housefile.  Wiland also maintained computer lists which W&H owned

_____

[11]    In 1986, Washington Lists changed its name to Capitol List.  Hereinafter, use of the term Washington Lists includes, where applicable, reference to Capitol List.

or co-owned with its other clients.  Wiland, as instructed by W&H, automatically merged and added to W&H's masterfile on a monthly basis all new names and donor information that had been added to petitioner's housefile.  W&H's masterfile included the names and donor information that was owned by W&H or was jointly owned by W&H and its clients.  W&H had joint ownership rights in most of the client housefile mailing lists developed under the fundraising contracts it entered into with its nonprofit clients; W&H did not have such an arrangement with respect to AICR.

In conducting petitioner's prospect mailings, prospect mailing packages were mailed to the following categories of names and addresses (hereinafter for convenience referred to as names): (1) Names that W&H, as lessor, rented to petitioner from the W&H masterfile, (2) names that Washington Lists arranged for petitioner to rent as lessee from outside list owners unrelated to W&H, (3) names that W&H, as lessor, rented to petitioner through Washington Lists which names W&H obtained from outside list owners in exchange for petitioner names, and (4) names that W&H, as lessor, through Washington Lists rented to petitioner which names W&H obtained from outside list owners in exchange for non-petitioner names on W&H's masterfile.

The Contract forbids petitioner to exchange or to rent as lessor its housefile list names.  When petitioner as lessee used names from W&H's masterfile, W&H charged petitioner W&H's advertised rental rate for the names published in the current

"Standard Rate and Data" publication (hereinafter sometimes referred to as SRD).  SRD is a direct mail industry advertising publication that sets forth the characteristics of a number of mailing lists available for rental, the rental rates, and the name and telephone number of the particular list owner or list owner's agent to contact.  When petitioner as lessee used names that W&H obtained from outside list owners either through exchanges of petitioner's housefile list names or exchanges of non-petitioner names on the W&H masterfile, W&H charged petitioner the outside list owner's currently advertised SRD-published rental rate for the names furnished to petitioner or, if no current SRD-published rental rate existed for the names furnished to petitioner, W&H's currently advertised SRD-published rental rate for the names W&H gave up in the exchange transaction.

Generally, by engaging in an exchange transaction, a list owner is able to obtain additional names at a significantly cheaper cost than it would otherwise incur to use the names as a lessee in a rental transaction.  For instance, in a typical exchange transaction, the two list owners involved might agree that each would furnish to the other 10,000 of their respective housefile list names that meet certain prescribed specifications. The two owners would not pay one another any cash fee; the only costs an owner would incur include computer-related production costs for a computer tape or mailing labels containing the 10,000

names that owner furnishes, postage to ship the tape or labels, and a list broker's fee or list manager's fee[12] for arranging the exchange transaction.

When W&H exchanged for petitioner names it owned jointly with petitioner, the cost to W&H of acquiring the third party's names included charges for computer processing, postage, and a list broker's or list manager's fee. W&H did not pay a rental fee to the owner of the third-party names in these situations, because W&H was providing names to the third party that normally rented for $60 per thousand names.

Table 8 shows the amounts petitioner as lessee paid to Washington Lists by way of mailing list rental fees for renting mailing lists which W&H owned or mailing lists to which W&H claimed mailing list rights. The payments petitioner made to W&H include payments for names that W&H acquired by exchanging petitioner's names for names owned by unrelated third parties.

Table 8

| Year | Payments for W&H Masterfile Names | Payments for Names W&H Obtained by Exchanging Petitioner Names |
|------|-----------------------------------|----------------------------------------------------------------|
| 1984 | -0- | $1,450 |
| 1985 | $6,448 | 57,349 |
| 1986 | 44,645 | 119,436 |
| 1987 | 122,747 | 219,896 |
| 1988 | 32,408 | 24,660 |

---

[12] In the direct mail industry, a list manager functions as a sales agent who represents a list owner in marketing the list owner's mailing list to others. The list manager promotes the mailing list and arranges for rentals and/or exchanges of the mailing list to other parties.

| | | |
|---|---|---|
| 1989 | -0- | -0- |
| Totals | 206,248 | 422,791 |

When W&H obtained names for petitioner to use as lessee, including non-petitioner names from W&H's masterfile and third-party names for which W&H exchanged petitioner names, W&H charged or passed on any direct out-of-pocket costs of obtaining those names to petitioner.  These out-of-pocket costs included computer-processing charges and mailing charges.

W&H's masterfile had numerous subparts or discrete "list selects" that could be selected via computer processing.  For example, list selects of all donors to sweepstakes contest appeals, all donors to health causes, all donors to cancer-related health causes, or all donors to a particular W&H client, could be obtained through computer selection.

During 1984 through 1989, W&H exchanged segments of petitioner's housefile list between 200 and 300 times.  These exchange transactions involved as few as 5,000 petitioner names or as many as 300,000 petitioner names.

For each of these exchanges, W&H charged petitioner the published SRD rental fee of the names received in the exchange; if no published SRD rate existed, then W&H charged petitioner the published SRD rental fee of petitioner's names that were given up in the exchange.  UCC's payments to W&H on account of these charges constituted income to W&H.

W&H also rented as lessor the names on its masterfile to third parties, including other W&H clients and W&H-controlled entities. Petitioner's names could be separately selected from the W&H masterfile and were occasionally rented by W&H to third parties as a discrete, separate list of petitioner names. Petitioner's names were also contained in lists rented by W&H to third parties mixed together with non-petitioner names. On the record in the instant case, it is virtually impossible to determine how often any particular petitioner name was rented as part of a mixed list.

From 1984 through the time of the trial in the instant case, W&H as lessor rented discrete segments of petitioner's housefile names about 50 to 80 times. These rental transactions may have involved as few as 5,000 petitioner names or as many as 300,000 petitioner names.[13] From 1984 through the time of the trial, in the instant case, W&H as lessor rented segments of the W&H masterfile more than 2,000 times. Any such rental may have involved no petitioner names, one petitioner name, or a substantial number of petitioner names. On at least one occasion as many as 300,000 petitioner names were contained on a rented

---

[13] For example, a list rental order dated Jan. 1, 1990, submitted on behalf of the Norris Hospital at the University of Southern California to W&H, reflects that an 8,500-name "representative cross section" of certain petitioner names was being ordered. The order indicates that the segment of petitioner names selected consisted of donors who had made a donation of $5 or more to petitioner within the past 24 months. Note that the Contract had expired more than 7 months earlier.

segment of the W&H masterfile.

W&H as lessor rented petitioner names at rates that were common in the list rental market. A typical rate was $60 per thousand names.

The Contract did not require W&H to, and W&H did not, notify petitioner before renting parts of the W&H masterfile including petitioner's names to third parties. Pursuant to the Contract, W&H retained all rights to approve a mailing sample of what would be mailed by the third parties renting parts of W&H's masterfile. W&H also retained all rights to control the mailing dates when these third parties using parts of W&H's masterfile would make their mailings to the rented list names.

During the term of the Contract, some of petitioner's directors and staff became aware that W&H was exchanging petitioner housefile names for other names, and then charging petitioner full regular rental rates for the use of the other names. Some of petitioner's directors and staff also became aware that other W&H clients, including certain nonprofit cancer organizations, were mailing fundraising packages similar to petitioner's. They were further aware that W&H possibly could be renting or otherwise providing petitioner housefile names to the W&H clients that were mailing fundraising packages which were similar to petitioner's. In fact, W&H did so use petitioner's housefiles and did mail similar sweepstakes packages for petitioner's "competitors". Petitioner did not try to have W&H

stop such activities, as petitioner concluded that W&H was acting within its rights under the Contract.

Under the Contract, it would have been improper for W&H to impose a markup on charges made by suppliers. Thus, if W&H secured a desired mailing list for petitioner as lessee, and the lessor charged $55 per thousand, then it would have been improper for W&H to pass a cost of $60 per thousand on to petitioner. W&H and petitioner operated in accordance with the Contract. However, when W&H "paid for" the desired mailing list by exchanging one of petitioner's mailing lists for it, so that the lessor imposed no monetary rental fee, then, as petitioner's staff understood the Contract, it was appropriate for W&H to pass on to petitioner a rental fee in the amount that the lessor would have charged for the desired mailing list if the lessor had not instead received petitioner's mailing list in exchange. In exchange situations, then, W&H received as its own revenue the "as if" rental that the lessor had not in fact charged, as well as W&H's regular fees under the Contract.

The bar against petitioner's exchanging its own names extended past the term of the Contract. Because petitioner could not exchange its own names, petitioner had to pay the greater costs associated with renting names from others.

E. Sweepstakes Mailings

The first sweepstakes contest mailing that W&H conducted was done under the Contract. W&H then used sweepstakes contest

mailings extensively with most of its other clients.  Before they formed W&H, both Watson and Hughey had experience with the use of sweepstakes contests on behalf of either their employers or their clients.

As part of its initial program of prospect mailings for petitioner, W&H tested various packages.  A "check" package performed best and became petitioner's "control" package--a package that is mailed until a later package can net more money. In November 1984 a sweepstakes (sweeps) package was tested and also performed well.  As Watson put it in an October 15, 1985, memorandum to several of petitioner's directors and its executive director, "At this point UCC had two control packages, the check package which could be mailed to the traditional donor market; and a sweepstakes offer which could be mailed to markets that respond to sweepstakes."

A January 1985 major prospect mailing was planned using the check package.  However, although the package had been approved by petitioner, petitioner's board of directors then urged that the check package be replaced by a different package.  That different package then lost $110,000.[14]

---

[14]    The record reflects that petitioner's directors directed the check package not be used, because they believed certain representations contained in the package were inaccurate. Recipients of the package were informed that if they made a contribution, petitioner then essentially would receive a matching donation from another party.  In actuality, at the time the solicitation was made, petitioner had not yet secured a

(continued...)

In August 1985 an "annual fund" package was successfully
tested.  As a result, petitioner again had two control packages.
An annual fund package was first mailed out in substantial volume
(almost 500,000 letters) in December 1985.

Apart from the foregoing, for petitioner every substantial
volume prospect mailing and almost every test prospect mailing in
1985 was a sweeps package.  Five of these 1985 sweeps prospect
mailings each lost more than $100,000; one lost $228,569.

However, from mid-1986 to mid-1987, sweeps packages produced

14(...continued)
commitment from another party to make matching contributions.

In his letter dated Feb. 19, 1985, to petitioner's executive
director, Watson complained that the projected $70,000 loss on
the Jan. 1985 poll package mailing (excluding at least another
$45,000 due W&H in fees) done at petitioner' directors' urging
was the largest single loss W&H ever experienced.  He stated that
it was essential that what happened not occur again and formally
requested that once petitioner approved a mailing package that
petitioner be committed to the package's use, unless it was
"obvious and conclusive" that the package's continued use would
result in irrevocable harm to petitioner.  His letter concluded,
in pertinent part, as follows:

> I'm sure you are disappointed in what has happened in
> regard to this Poll package mailing.  But, I assure you, no
> one is as concerned as I am.  I hope it has been a lesson
> for us all.

> I had the hope, and still have the dream, that UCC
> could be made financially strong within a relatively short
> time.  And, I pray this setback doesn't postpone that day
> too long into the future.

Copies of this letter to the executive director were also sent by
Watson to three of petitioner's directors.

the greatest percentages of responses to prospect mailings. Also, contrary to the usual experience with prospect mailings, some sweeps packages produced substantial profits.

Although the sweeps packages were often profitable for petitioner, they had their drawbacks. Sweeps packages generally worked on individuals who were primarily interested in playing the contest, as opposed to being interested in supporting petitioner. In his memorandum dated July 9, 1986, to petitioner's executive director, Watson, in generally commenting on petitioner's direct mail campaign, made the following observations about the sweeps package donors who contributed to petitioner:

> UCC basically has two donor files--one being sweepstakes donors and the other being regular or straight donors.
>
> The Sweepstakes file makes up 80% of all donor names and the straight file has the balance of 20%.
>
> Although sweeps names have a higher conversion rate into second and third donations, the life span of these donors is less than straight donors.
>
> We are continuing to try to expand the straight file which is a true donor base and is the one that can be tapped for future major gifts.  * * *

> * * * * * * *

> In summary, it appears that the UCC direct mail fundraising program is healthy and shows signs of continued improvement. As the straight donor file expands, it should lend stability to the monthly income for UCC. The sweepstakes housefile mailings should continue to provide the buffer needed to provide the minimum revenues to help UCC make its monthly budgetary commitments.

In addition to the problem that Watson noted, some of the

sweepstakes contest mailings generated adverse publicity for petitioner, because some individuals who received the mailings believed the solicitations were misleading. The adverse publicity petitioner experienced in conducting its direct mail campaign is discussed more fully infra.

Although W&H attempted to convert some of petitioner's sweepstakes donors into straight donors by sending them non-sweepstakes mailing packages, the conversion efforts were not successful. W&H concluded that the only way to obtain further contributions from sweepstakes donors was to continue to send them sweepstakes contest mailing packages.

During 1985 through May 1989, sweepstakes contests mailings were used heavily in petitioner's direct mail fundraising campaign. Beginning in late 1987 or early 1988, petitioner sharply reduced the numbers of sweepstakes contest prospect letters it mailed, because petitioner realized the sweepstakes contest prospect mailings were not helping petitioner to develop a strong housefile. In his letter dated January 28, 1988, to the W&H executive who handled petitioner's account on a daily basis, petitioner's executive director responded as follows to the W&H executive's prior argument that petitioner should not reduce the level of its 1988 prospect mailings so greatly below the level of the 1987 prospect mailings, because the 1987 prospect mailings, the W&H executive claimed, had added 1 million new names to petitioner's housefile:

Your reference to the 1 million names added in 1987 housefile is interesting. Why were we continuing to mail to only 300+ thousand with housefile packages given this million "new" names? My opinion is that we both knew those names wouldn't produce due to their acquisition from sweeps. And if they did work, their lifespan was a matter of weeks, not months. We wish to see greater cultivation of housefile names with new packages and straight packages. If we only get 180,000 names or less, but they have been generated via quality straight packages, we will be better off than adding another 1 million sweeps players.

In November 1988 petitioner stopped conducting prospect mailings. During 1984 through 1988, a total of 90 prospect mailings were done in petitioner's direct mail fundraising campaign. Of the 90 prospect mailings, 71 involved the use of sweepstakes contest mailing packages. The total number of prospect letters mailed in petitioner's mailing campaign was 51,771,026, of which 37,546,124 involved the use of sweepstakes contests.[15]

---

[15] So stipulated. The parties stipulated as an exhibit W&H's July 1, 1989, status report to petitioner. In that exhibit, the listing of the 90 prospect mailings occupies three pages. The stipulated number of letters is the total of the prospect mailings listed on the first two pages of this portion of the exhibit. The total for the prospect mailings listed on all three pages is 57,758,533. Only 48 of the prospect mailings are identified in the status report with the word "sweeps"; these 48 involve 32,671,489 letters. We cannot clearly identify which 23 of the 42 other prospect mailings are among the 71 stipulated sweeps prospect mailings. Based on the descriptive terms used in the status report, our best estimate is that the status report shows that the 71 stipulated sweeps prospect mailings involved about 41-43 million letters.

Similarly, the parties have stipulated that the status report shows 75 housefile mailings, of which 47 were sweeps letters, and a total of 27,849,216 housefile mailings letters of

(continued...)

As of May 19, 1989, near the end of the term of the Contract, petitioner's housefile contained a total of 2,084,019 donor names, of which 1,165,153 were "active names" and 918,866 were "inactive names".[16]  As of May 8, 1989, petitioner's housefile contained 1,164,698 "active donor names", which had been produced from the sources indicated in table 9.

Table 9

| Source | Number of Names |
| --- | --- |
| Sweepstakes Mailings | 810,411 |

---

[15](...continued)
which 19,915,212 were sweeps letters.  The stipulated status report shows 75 housefile mailings, but a total of only 21,849,216 letters.  The 47 sweeps housefile mailings that we were able to identify involved 17,313,153 letters.

It may be that the status report misidentified mailings totaling about 6,000,000 names.  Although the discrepancy between the stipulation and the stipulated exhibit is substantial (more than 10 percent of the total), it does not affect our ultimate conclusions.

[16]    The parties stipulated to these numbers of "active names" and "inactive names".  An invoice dated May 19, 1989, to petitioner from Wiland, the computer company that maintained petitioner's housefile, reflects that Wiland had prepared a computer tape of petitioner's housefile that contained 1,165,153 "active names" and 918,866 "inactive names".  According to Dan Wells, an employee of Wiland who testified at trial, "active names" were the names that petitioner had mailed most recently. Interestingly, Watson, during his testimony, estimated that petitioner's housefile, as of the May 30, 1989, date petitioner's contract with W&H ended, contained approximately 250,000 to 300,000 "active names" and another 1 million "inactive names". Watson, however, defined "active names" to be names which, at that point, would produce a profit if mailed to, and "inactive names" to be names which, at that point, would not produce a profit if mailed to.  He elaborated that the actual categorization of a particular name as "active" or "inactive" results from applying a complex statistical aging formula.

| | |
|---|---|
| Non-Sweepstakes Mailings | 279,084 |
| Miscellaneous | 75,203 |
| Total | 1,164,698 |

## F. Adverse Publicity

As a result of its direct mail fundraising campaign and its association with W&H, petitioner received adverse publicity. This adverse publicity began in or about November 1984 and persisted through the term of the Contract.

In late 1984, some of petitioner's directors and staff began receiving complaints and inquiries about the direct mail fundraising campaign petitioner was conducting. Adverse newspaper articles concerning petitioner had been published. The negative press came from all parts of the country to which petitioner was mailing fund-raising letters. The areas of concern raised in the complaints or inquiries included (1) W&H's control of another cancer charity, AICR, (2) the mailing packages petitioner employed, (3) the adverse impact of mailings done in certain areas covered by petitioner's member agencies, and (4) whether petitioner was spending a sufficient portion of its receipts for charitable purposes, as distinguished from spending for fundraising and administration.

At petitioner's board of directors meeting on November 17, 1985, the board members viewed and discussed a videotape of an unfavorable Dayton, Ohio, television news story about petitioner's direct-mail fundraising. The news story focussed on

petitioner's asserted high-pressure fundraising tactics and sweepstakes contests.

Petitioner's directors were divided concerning the course of action petitioner should pursue as a result of the above adverse publicity petitioner experienced. Some directors wanted petitioner to discontinue its direct mail fundraising campaign entirely. However, a majority of the directors decided that petitioner's direct mail fundraising campaign should be continued and that the adverse publicity was a problem which could be managed. Financial considerations were a controlling factor in the majority's decision to continue the direct mail campaign. The fundraising arrangement with W&H accounted for substantially all of petitioner's operating funds. Additionally, at this time, petitioner was fully liable on a recourse basis to W&H for the excess draws petitioner had obtained from the Escrow Account. Although petitioner had tried, at various times, to develop other sources of funds, these efforts were not successful and petitioner remained heavily financially dependent on its direct mail fundraising campaign revenues throughout the term of the Contract.

In early 1987, NCIB issued a report on petitioner that, among other things, concluded petitioner's fundraising expenses for 1985 equaled about 97.7 percent of the related contributions

petitioner received.[17]  The NCIB report resulted in further
adverse publicity for petitioner.

In or about September 1986, petitioner began using a
sweepstakes prospect mailing package known as the Instant Cash
package.  The Instant Cash package mailings were highly
profitable for petitioner--especially unusual for prospect
mailings.  However, petitioner's use of this sweeps package
resulted in adverse publicity for petitioner.  After receiving
complaints from contributors who received the Instant Cash
Package,[18] petitioner stopped using the package by about June
1987.

At petitioner's board of directors meeting on June 13, 1987,
its executive director proposed that petitioner establish a
cancer patient assistance fund which it would fund with $2,000
per month.  In discussing the proposed patient assistance fund,

---

[17]  As is discussed infra, table 10 and the text following, NCIB did not accept petitioner's allocation of a portion of its direct mail campaign expenses to public education.

[18]  Recipients of the package were informed that they were winners in a contest with a prize of $5,000, if they would enter the contest.  As applicable State laws generally prescribed that the recipients of such sweepstakes contest solicitations be allowed to enter the contest without making a contribution, they were also asked, but not required, to make a contribution to petitioner.  Although the solicitation letter also indicated that the actual amount won by a recipient would be decided in a later drawing, the individuals who complained to petitioner believed the package was deceptive.  In actuality, the $5,000 prize money awarded in the contest would be split evenly among all the contestants who entered the contest, and these contestants typically received about $.09.  In some instances, petitioner refunded the contributions it received from the complainants.

petitioner's executive director stated that the direct mail campaign is a form of public relations, some viewing it as a negative form, but with a cancer patient assistance fund in place it could be turned around to a positive form in the future.

In April 1988, petitioner retained a consultant to assist petitioner in soliciting donations and grants from corporations and foundations.  The consultant reported to petitioner on the May 6, 1988, meeting that took place between the consultant and an executive with the Lilly Endowment, a large foundation in Indianapolis.

The consultant advised that the Lilly Endowment's executive's unfavorable reaction to petitioner during the meeting indicated that petitioner's continuance of its fundraising contract with W&H would jeopardize petitioner's efforts to obtain funding from corporations and foundations.  The consultant advised that "It is doubtful that Lilly will ever fund UCC * * *. Perhaps a case could be built three or four years after the termination of the direct mail consultant contract."

The consultant's report was given to petitioner's Administrative Fundraising Committee, and mentioned by this committee in its May 11, 1988, report to petitioner's Executive Committee.

Several of petitioner's affiliate member agencies withdrew from petitioner as a result of the adverse publicity petitioner experienced.

In addition, investigative inquiries with respect to petitioner's direct-mail fundraising activities were begun by various State attorneys general, including the attorneys general for Alabama, Illinois, Maryland, Massachusetts, New York, and Pennsylvania. Later, lawsuits were begun by some of the State attorneys general, including the attorneys general for New York and Pennsylvania.

G. Petitioner's Escrow Account-Related Problems

1. Draws and Petitioner's Dispute With W&H Over the Calculation of Cumulative Net Mailing Campaign Revenue

Pursuant to its draw arrangement with W&H, petitioner received monthly draws from the Escrow Account maintained by WIB. See supra table 6 & preceding text. In late 1984 these draws were $5,000 per month. W&H exercised final authority with respect to approving and directing WIB to release the funds petitioner sought. Even though the Escrow Account was in petitioner's name and WIB considered that the funds in the Escrow Account belonged to petitioner, WIB paid money out of the Escrow Account only in response to check requests submitted by W&H. This was so whether the payments were (1) to vendors in connection with petitioner's fundraising activities (in which events WIB also required the vendors' invoices), (2) to W&H, or (3) directly to petitioner.

Petitioner could not have obtained immediate possession of the funds that WIB held in the Escrow Account by unilaterally

revoking the Escrow Agreement between petitioner, WIB, and W&H. If a dispute between petitioner and W&H had arisen with respect to the disposition of the funds held in the Escrow Account, then WIB would have frozen the account.

At petitioner's executive committee meeting on July 19, 1986, the committee members directed petitioner's staff to ask W&H to increase petitioner's monthly draw from $40,000 to $64,000, beginning August 1, 1986. During the meeting, petitioner's executive director expressed his reservations about petitioner's increasing the amount of its monthly draws, unless W&H provided written assurance that petitioner would not have to repay the excess draws it received. However, the executive committee member who proposed that petitioner should seek to increase its monthly draw, responded that he wanted to have those funds in UCC's control and accounts despite the possible future need to repay W&H. This member's proposal was further supported by another of the committee members.

At petitioner's executive committee meeting held on September 25, 1986, a W&H executive who attended a part of the meeting advised the committee members that W&H was of the opinion that petitioner should not increase its monthly draw beyond the then-current $40,000, because of a decrease in petitioner's housefile mailing income. W&H suggested that petitioner wait until January 1987 before increasing its monthly draw to $50,000. Petitioner's monthly draw was increased to $50,000 beginning in

January 1987, and was again increased, to $60,000, beginning in January 1988.

In his letter dated November 4, 1988, to Watson, petitioner's executive director advised Watson that there was a substantial discrepancy between W&H's calculation of petitioner's Escrow Account balance and what petitioner calculated its Escrow Account balance to be. The executive director asked that W&H authorize transfer from the Escrow Account of the entire remaining $90,000 of petitioner's draws for 1988.

In his letter dated November 23, 1988, to Watson, petitioner's executive director acknowledged petitioner's receipt of its mid-November, semimonthly draw of $30,000 from the Escrow Account, and stated that he assumed petitioner would be receiving its draws for 1988 as originally scheduled, rather than in the lump sum he had asked for in his November 4, 1988, letter. He further asked that W&H immediately transfer to petitioner half of the proposed $300,000 it would draw from the Escrow Account for the period January through May 1989.

In his letter dated December 28, 1988, to Watson, petitioner's executive director advised that petitioner's Executive Committee had decided petitioner should stop receiving monthly draws of $60,000 from the Escrow Account, and instead receive 50 percent of the housefile mailing income, based on petitioner's calculation of the net housefile mailing income. Petitioner's executive director stated that these transfers are

to be made within 10 working days of petitioner's calculations.

In her letter dated February 15, 1989, to Watson, petitioner's chief financial officer enclosed a copy of petitioner's tentative calculation reflecting, as of January 1989, a $92,358.03 positive balance of cumulative net income from the direct mail campaign. As petitioner had not received all invoices of mailing expenses in connection with the January 1989 mailings, petitioner's chief financial officer asked that petitioner be paid $75,000, which would leave another $17,000 to cover any additional mailing expenses. Her letter stated that if W&H had any questions regarding any of this, petitioner should be contacted, otherwise petitioner would expect to receive its requested check for $75,000 no later than February 21, 1989.

In her letter dated May 9, 1989, to a W&H executive, petitioner's chief financial officer noted that there was a substantial discrepancy between petitioner's and W&H's respective computations of cumulative housefile net income, as of December 31, 1988. Petitioner's chief financial officer stressed that petitioner's figures were audited. Petitioner computed that, as of December 31, 1988, its cumulative housefile income was $1,930,909, its cumulative transfers from the Escrow Account amounted to $2,078,200, and there was a resulting deficit of $147,291. In contrast, W&H computed that the cumulative transfers were only $1,973,000, but there was a deficit of $540,711. W&H prepared a status report dated July 1, 1989, in which it took the

position that, as of April 30, 1989, the cumulative transfers had grown to $2,213,000 and the deficit had risen to $687,712.

In order to wind up the fundraising arrangement between petitioner and W&H, the Escrow Account was kept open until at least September 30, 1989, as petitioner's last housefile mailing under the Contract was sent out in early May of 1989. Petitioner expected that W&H would render a final accounting to it on September 30, 1989. However, no final accounting was ever made or agreed to by petitioner and W&H.

Petitioner's position is that all debts incurred for prospect mailings had been paid for by the revenues produced from the mailing campaign, and that petitioner did not owe any money to W&H.

2. <u>W&H's Purchase and Invoice Control Procedures</u>

Similar to the authority it exercised with respect to the funds petitioner sought from the Escrow Account, up until about 1987, W&H generally exercised final authority with respect to approving and directing WIB to release funds to pay the direct mail campaign's expenses. As indicated above in discussing the Escrow Agreement, the sole exceptions to W&H's authority concerned WIB's transfer of Escrow Account funds to pay "Business Reply" postage and invoices for WIB's own services. Beginning about 1987, W&H generally obtained petitioner's approval with respect to the payment of certain vendor invoices, before issuing payment instructions to WIB.

During 1984 through 1989, W&H generally furnished WIB with copies of all vendor invoices along with check requests and payment instructions.  WIB relied on W&H to tell WIB that petitioner had approved the check requests.  When WIB paid an invoice, it promptly sent to petitioner a copy of the invoice, the check request, and payment information.  Any time that petitioner called WIB to ask questions about an invoice, WIB referred petitioner to W&H, because WIB did not review the correctness or appropriateness of the invoices to petitioner.  Petitioner never asked WIB not to pay a vendor invoice.  However, on at least one occasion W&H authorized a payment without petitioner's approval; W&H finally agreed that it would pay that bill.

In a memorandum dated October 15, 1985, Watson addressed and discussed a number of matters raised during an October 8, 1985, meeting between himself, two of petitioner's directors, and petitioner's executive director.  Among the matters dealt with in the memorandum are W&H's procedures with respect to its issuance of purchase orders, processing of invoices, and issuance of check requests to WIB to pay invoices.  W&H's asserted practice was to send to petitioner copies of purchase orders for all goods or work contracted by W&H.  After completion of the work or delivery of the goods and W&H's receipt of an invoice from the vendor, the W&H account executive reviewed the invoice for accuracy and returned it to W&H's accounting department.  A check request was

then prepared and sent to WIB, and a copy of that check request was also sent to petitioner. In his memorandum, Watson stated that "Should UCC wish to raise a question concerning any bill, all they need to do is pick up the telephone and call the escrow agent [WIB] and request that payment be held up until UCC is satisfied."

In his October 15, 1985, memorandum Watson also responded to petitioner's concern that W&H, as required by the Contract, make reasonable efforts to solicit competitive bids from vendors, where time and market conditions permitted. Watson explained that W&H's executives, in soliciting bids, prepared specifications for the various goods and services needed on a standardized 7-part purchase order form. The executives then contacted prospective vendors, advised them of the specifications for the goods and services sought, and requested bids. The bids submitted typically were given to the executives over the telephone, rather than in writing. However, the W&H executives who received these bids recorded the bid, the name of the company making it, and the date the bid was submitted, on the last page of the purchase order. Watson maintained that requiring W&H to obtain written bids, as petitioner wanted, would be too cumbersome a procedure and might deter prospective bidders from submitting bids. If petitioner wanted to audit a bid, Watson suggested, then petitioner could contact various vendors and ask them for their internal documentation on the bids they had submitted to W&H.

Among the concerns raised by petitioner's certified public accounting firm in its later management letter dated May 23, 1986, to petitioner's board of directors and executive committee, are the following:

2. W&H Responsibility for Documentation.

It is our understanding that certain procedures in the areas of purchasing and cash disbursements are executed by W&H personnel.  We performed a limited test of such procedures and have the following observations:

a.   We could not locate a check request for each cash disbursement.  It was our understanding that at the very minimum, each check issued is to have a corresponding check request identified with it.  The check request is the only document which indicates W&H approval of the cash disbursement.

b.   During our testing, there were several instances where we could not locate the invoice(s) associated with specific checks.  We recommend that Council personnel perform a timely limited review of all cash disbursements to insure that the proper supporting documentation exists.  One area that needs special attention is postage.  Although invoices are not issued for postage disbursements, receipts are given to W&H upon payment.  We strongly recommend that the Council request that the original postage receipt be sent to the Council and if W&H requires the receipts for their files, they could retain a copy of the receipt.  Although our testing did not indicate that any of the checks written for postage were used for items other than postage, the receipts would provide verification of these substantial expenditures.  [See supra table 7, which shows that postage and shipping was petitioner's largest category of expenses for 1985, 1986, 1987, and 1988.]

c.   W&H appears to be decidedly lacking in its adherence to the stated procedures regarding obtaining competitive bids on behalf of the Council.  A number of the goods and services are paid for on a contractual basis so that the main items subject to purchase using competitive bids are printing and mailhouse costs.  Of the items we examined on a test basis which should have been subject to competitive bids, we could find documentation that bids had been obtained only

approximately 50% of the time.  It is possible that bids were obtained over the phone, but not documented. In some instances, the documentation we reviewed stated that a bid could not be obtained due to time constraints.  We do not understand how this could occur as the mailing schedule is determined months in advance.  Another possibility which exists is that competitive bids are not obtained but documentation is provided that states bids were obtained to pacify council personnel requesting adherence to the stated procedures regarding obtaining bids.  True compliance testing of the procedures can only be achieved through independent verification with the vendors involved.

3. Lack of Timely Information.

The final major item we would like to discuss concerns the lack of adequate, timely financial information summarizing the activities of the direct mail campaign. It is our understanding that management decisions are often based on financial information obtained from reports generated by W&H and the modified cash-basis monthly financial statements prepared by the Council's accountant.  This could be a dangerous course.  We have made two attempts to reconcile financial information in the W&H reports to the Council's financial records and have been unable to do so.  We were then informed by * * * Watson that these reports were not complete, contain several estimates, and would probably not agree with the Council's books.  Therefore, we strongly recommend that the Board not rely quite so heavily on the reports generated by W&H.  The best course of action would be for Council personnel to prepare the monthly financial statements in the same manner as they have been prepared at December 31, 1985.  However, given current circumstances, it would be impossible to do this on a timely basis.  One problem is that W&H can take up to four months to record an invoice in accounts payable, particularly W&H's own invoices.  With that kind of time lag, the Council cannot determine the true accounts payable at month-end until four months later. * * *

Petitioner's concern about W&H's use of reasonable efforts to obtain competitive bids from vendors continued throughout the term of the Contract.  During 1986 and 1987, petitioner further discussed with W&H petitioner's desire to exercise more control

over the payment of its direct mail campaign expenses.  However, petitioner's efforts to obtain full control over disbursements from the Escrow Account ultimately were unsuccessful.

In his letter dated July 31, 1986, to Watson, petitioner's executive director confirmed that he and petitioner's chief financial officer would be attending a meeting at W&H's offices on August 12, 1986.  As part of the agenda for their meeting, the executive director enclosed for Watson a list of petitioner's "staff concerns".  Among the listed staff concerns, was one which stated that the "EXECUTIVE COMMITTEE MOVED TO BRING ALL ACCOUNTING FUNCTIONS IN-HOUSE EFFECTIVE JANUARY 1, 1987.  Approval of all invoices and check requests shall come from the UCC Headquarters, as well as the actual writing and reconciliation procedures."

In his letter dated August 21, 1986, to Watson, petitioner's executive director stated his understanding that, at the August 12, 1986, meeting with Watson, "It was agreed that when UCC demonstrates the capability of assuming escrow authority and the escrow account debt level is significantly reduced, then UCC will become the escrow agent."

In her letter dated January 14, 1987, to petitioner's chief financial officer, preparatory to a meeting scheduled for January 28, 1987, a W&H executive stated as follows concerning petitioner's previously expressed desire to take over management of disbursements from the Escrow Account, beginning in early 1987:

Concerning moving the Escrow Account Payable management to the [petitioner's] Carmel office early in 1987, you are probably referring to the discussion we had concerning this matter during the last visit by you and * * * [petitioner's executive director] to our offices in Alexandria. At that time, we mentioned that only one of W&H's clients handles this function in that way. That organization maintains a surplus cash balance in their accounts in excess of $2 million and a positive fund balance of over $400,000. It is our policy that once a client is able to develop a positive fund balance or the outstanding deficit can otherwise be reduced to a reasonable level, we would be supportive of such a move as we have been in the past.

Frankly, with nearly $500,000 in outstanding postage loans to UCC on the books as of last week, it makes us somewhat nervous to hear mention of this again for the reasons outlined in your letter. Certainly those areas that were brought up can easily be overcome. If, on the other hand, there has been any serious discussion within your organization which is outside the scope of what we have already stated, I would appreciate your advising me so that we can review this with * * * [Watson] and * * * [the W&H executive who handled petitioner's account on a daily basis].

In her letter dated January 30, 1987, to Watson, petitioner's chief financial officer discussed her understanding, from her meeting and discussions with Watson and two W&H executives on January 28, 1987, of some actions W&H would take to address petitioner's concerns with respect to the conduct of its direct mail campaign and the accounting for and disbursement of funds to pay the mailing campaign expenses. Among these actions to be taken by W&H, the letter states that Watson "will write an addendum to the * * * [Escrow Agreement] which would allow the Council to approve invoices paid by the Escrow Agent [WIB]. The Council would be able to provide written requests for payment of invoices without the approval of * * * [W&H]." With respect to

petitioner's desire to control the funds held in the Escrow

Account, the chief financial officer's letter states as follows:

> 11.  Again, the Council desires to obtain control of
> Accounts Payable through a separate bank account which
> would be funded by the current Escrow Account.  Our
> reason is the lack of control we currently have over
> Escrow Account Funds.  While I appreciate  * * *  [the
> W&H executive who handled petitioner's account on a
> daily basis'] wish to shield us from the aggrevations
> [sic] associated with Accounts Payable, I feel the
> Council is quite capable of shouldering the
> responsibility.  If the other changes requested
> previously in this letter occur within the next few
> months, we will be willing to delay the transfer for a
> period of time.  Ultimately, the Council wants to
> control all of its accounts.

In her letter dated March 10, 1987, to a W&H executive,

petitioner's chief financial officer objected that the January

31, 1987, listing of accounts payable submitted by W&H that were

to be paid, contained invoices previously disapproved by

petitioner.  Petitioner's chief financial officer complained that

it appeared to her that W&H intended to circumvent the invoice

approval procedure that had been established.  Her letter further

stated as follows:

> This scenario only emphasizes the lack of control the
> Council [petitioner] exerts over its own funds.  * * *
> [W&H] previously has expressed that the Council is incapable
> of managing the Escrow Account, yet the recent activity has
> been unacceptable to us and goes against standard accounting
> principles.  Just as * * * [W&H] insists on administering
> the Council's Accounts Payable, so will we insist that
> standard accounting policy be followed, which includes
> maintaining vendor correspondence and reviewing invoice
> costs.

The proposed addendum to the Escrow Agreement discussed in

petitioner's financial officer's above letter dated January 30,

1987, to Watson, was never executed by petitioner, W&H, and WIB. In his letter dated June 1, 1987, to petitioner's executive director, Watson offered to revise the Escrow Agreement to provide that petitioner would have the right to approve the payment of all invoices, if petitioner agreed to an early renewal of the Contract and entered the proposed new fundraising contract he enclosed.

Petitioner eventually abandoned its efforts to obtain full control over disbursements from the Escrow Account. In his letter dated June 16, 1988, to petitioner's certified public accounting firm, petitioner's executive director stated as follows:

> The Council [petitioner] chose not to bring all of the record keeping for accounts payable and cash disbursements in-house. W&H insisted that it would no longer be responsible for the prospecting debt if such action were taken. Mr. Watson explained that he did not want his firm to be responsible for the debt, in the event that the Council spent all of the proceeds of the campaign on programs and did not pay the fund raising expenses. Although we all agree that it would be considerably easier and more efficient for the Council to exercise direct control of the record keeping, the decision was made not to jeopardize the Council's financial health by incurring a large prospecting debt.

> We hope these explanations help you understand the Council's position and actions during the past year.

H. Petitioner's Attempt To Obtain A Copy Of Its Housefile

In July 1988, petitioner asked Wiland, the computer services company that maintained petitioner's housefile, to provide to petitioner a complete computer tape of its housefile, as of June

30, 1988.  Petitioner stated that it would pay for the file.
Petitioner's stated reason was that, "At the urging of our legal
counsel," it wanted to have a copy of the housefile "to maintain
a 'file copy' * * * in the event some disaster strikes Wiland".
Watson responded that Wiland has a file copy in the vault of a
bank in Fredericksburg, Va., and the safety procedures are
standard in the industry.  Watson also pointed to the Contract
provision that "'any computer work client desires to have done
with any names developed as a result of this contract with W&H
must be done at W&H or at a company designated by W&H during the
term of the agreement'".

In September 1988, Watson told petitioner that petitioner
would receive a copy of its housefile after the Contract ended,
in May 1989.

Petitioner's general counsel, James W. Curtis (hereinafter
sometimes referred to as Curtis), tried to get for petitioner a
copy of its housefile.  Curtis was not successful in persuading
W&H to provide to petitioner a copy of its housefile.  On January
19, 1989, Curtis formally notified Watson that petitioner was
invoking the arbitration provisions of the Contract and was going
to begin an arbitration action in order to obtain the copy of its
housefile.  After an unsatisfactory response from W&H's counsel,
on February 3, 1989, Curtis authorized another attorney to
prepare an arbitration petition for filing on petitioner's
behalf.  On February 9, 1989, Curtis spoke with Watson by

telephone, concluded that Watson appeared to be cooperative, and instructed the other attorney "to put the arbitration matter on hold".  On February 16, 1989, Curtis followed up the February 9 telephone call, asked for the housefile tape and certain other material needed to understand and use the housefile tape, and assured that petitioner would respect W&H's right to designate the company that would do any computer work with the housefile during the term of the Contract.  On February 24, 1989, W&H responded that it would direct Wiland to provide to petitioner a sample tape containing donor information on 10,000 names from petitioner's housefile, together with the other material that Curtis had asked for that was needed to understand and use the housefile sample tape.  W&H also agreed that "as soon as the entire housefile is needed by whoever ends up working on it, we can request that it be sent to them by Wiland."

On February 27, 1989, W&H advised Wiland that petitioner would transfer its housefile to another computer company after the Contract ended in May 1989.  W&H instructed Wiland to prepare a sample tape containing donor information on 10,000 contributors from petitioner's housefile and to provide certain other information about the housefile that would be useful to any other company in deciding whether to become petitioner's computer house.

Petitioner's and W&H's Respective Accounting Treatments
of the Direct Mail Campaign's Revenue And Expenses

On its financial statement and Form 990 for 1984, petitioner

failed to treat the direct mail campaign's expenses that exceeded the direct mail campaign's gross revenue as being its expenses.

In his letter dated December 20, 1985, to petitioner's executive director, Watson advised that petitioner's accounting treatment of the direct mail campaign's 1984 expenses was incorrect. Watson's December 20, 1985, letter stated, in pertinent part, as follows:

> The proper way to account for all your funds and expenses is to account for all of the income generated from UCC mailings as UCC income and all of the expenses related to all of the mailings must be recorded as UCC expenses. If * * * [W&H], through its direct mail assistance, raises $1,000,000 for UCC and spends $900,000 doing it, then the financial statements must reflect a gross income of $1,000,000 and $900,000 in expenses. * * * If your accountants are overly concerned about the * * * [Contract], I would recommend that they list the contract as a contractual obligation in the footnotes to the financial statement. And, they may want to even indicate that * * * [W&H] is potentially liable for any losses incurred in the fundraising efforts. But most importantly, and I have said this over and over again, * * * [W&H] is not the keeper of UCC funds. * * * [W&H] does not dole out net proceeds of fundraising campaigns to UCC.

On its 1985 through 1989 financial statements and Forms 990, petitioner treated all of the direct mail campaign's revenue and expenses as its revenue and expenses.

On its partnership returns, W&H included in "cost of goods sold" the postage advances it made and included in income the subsequent reimbursements it received for these advances.

Petitioner's Allocation of Expenses Between Fundraising
and Public Education

On its financial statements for 1985 through 1988,
petitioner concluded that substantially all of its direct mail
campaign expenses were "joint expenses" allocable to public
education and fundraising.  Its 1985 through 1988 financial
statements reflected that petitioner received total annual
contributions, and incurred joint expenses that it allocated to
public education and fundraising, as shown in table 10.

Table 10

|  | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|
| Contributions | $5,087,453 | $7,869,015 | $10,740,045 | $3,883,352 |
| Joint Expenses-- | | | | |
| Education | 2,301,260 | 3,843,907 | 4,306,377 | 1,463,432 |
| Fundraising | 2,647,470 | 3,390,012 | 5,399,344 | 1,693,333 |

Petitioner's certified public accounting firm advised it of
certain factors to be considered in allocating its direct mail
campaign expenses between public education and fundraising.  The
Accounting Standards Division of the American Institute of
Certified Public Accountants issued two Statements of Position
(hereinafter sometimes referred to as SOP), SOP 78-10 and SOP 87-
2, concerning the appropriateness of allocating fundraising
appeal expenses to a charitable organization's exempt purpose
function.  SOP 87-2[19] amended the earlier-issued SOP 78-10,

---

[19]     SOP 87-2, states in pertinent part, as follows:
(continued...)

primarily by providing additional matters to be considered, and had an effective date which made it applicable to petitioner's 1988 financial statement.[20] As petitioner's chief financial officer interpreted SOP 87-2, if the considerations set forth in that SOP were applied--

to 1986 or 1987, we would have to show all expenses of the Donor Development Fund as fund raising. This means that 96%

---

[19](...continued)

15. All joint costs of informational materials or activities that include a fund-raising appeal should be reported as fund-raising expense if it cannot be demonstrated that a program or management and general function has been conducted in conjunction with the appeal for funds. However, if it can be demonstrated that a bona fide program or management and general function has been conducted in conjunction with the appeal for funds, joint costs should be allocated between fund-raising and the appropriate program or management and general function.

16. Demonstrating that a bona fide program or management and general function has been conducted in conjunction with an appeal for funds requires verifiable indications of the reasons for conducting the activity. Such indications include the content of the non-fund-raising portion of the activity; the audience targeted; the action, if any, requested of the recipients; and other corroborating evidence, such as written instructions to parties outside the organization who produce the activity, or documentation in minutes of the organization's board of the organization's reasons for the activity.

[20] SOP 78-10 and SOP 87-2 address only whether allocation of a charitable organization's fundraising appeal expenses is appropriate. SOP 87-2 states that "this statement of position does not address the issue of how to allocate joint costs. A number of cost accounting techniques are available for that purpose."

of our total expenses (General Fund and Donor Development Fund), would be allocated to Supporting Services. Obviously, we cannot afford such a devastating report at the end of 1988, and must correct any deficiencies in the direct mail program immediately.

During 1984 through 1989, petitioner was well aware of the guidelines CBBB and NCIB established for members of the general public to use in evaluating charitable organizations that solicited contributions.  Petitioner planned and endeavored to meet eventually all of the CBBB and NCIB guidelines, as petitioner believed that doing so would enable it to gain more support from corporations, foundations, and the general public.

Although petitioner, during 1984 through 1989, was never able to meet all of the CBBB and NCIB guidelines, petitioner concluded that it was in its interest to allocate as much of the direct mail campaign's expenses to public education as possible. All of the mailing packages petitioner utilized during 1984 through 1989 contained some educational material.  A list of the "Nine Warning Signals of Cancer" was included with almost all the housefile and prospect letters petitioner mailed.  As its mailing campaign progressed, petitioner tried to increase the educational content of its mailings.

Petitioner's 1986 financial statements, published as part of petitioner's Annual Report for 1986, contain the following explanation of petitioner's allocations of its 1985 and 1986 mailing campaign "joint expenses" between public education and fundraising:

NOTE 4--ALLOCATION OF JOINT COSTS OF MAILINGS:

Expenses related to both  * * *  [prospect mailings and housefile mailings] are allocated to public education and fundraising based on the relative content and intent of all mailings.  The content of each and every mailing is evaluated to determine what percentage of the mailing satisfies the goal of educating the public and what percentage of the mailing deals with fundraising.  Public education includes any information about cancer, its treatment and cures as well as discussion of the Council's [petitioner's] programs in research and cancer patient services.  Fundraising includes direct requests for money as well as emotional appeals intended to solicit funds.  The relative content of individual * * * [prospect mailings and housefile mailings] are summarized and a composite percentage is determined which is then applied to total costs.  Since the goals of the direct mail campaign are to educate the public and to raise funds, none of the costs directly associated with the mailings are allocated to management and general [expenses?].

Petitioner's 1988 financial statement, published as part of petitioner's Annual Report for 1988, contain the following explanation of petitioner's allocations of its 1987 and 1988 mailing campaign "joint expenses" between public education and fundraising:

NOTE 5--ALLOCATION OF JOINT COSTS OF MAILINGS:

In 1988, the Council [petitioner] incurred joint costs of $3,156,765 for informational materials and activities that included fundraising appeals.  These joint costs are expenses related to both  * * * [prospect mailings and housefile mailings] and have been allocated as follows:  $1,463,432 to public education and $1,693,333 to fundraising.  In allocating the joint costs between public education and fundraising, the Counsel evaluates the content or message of the mailing and the intended audience.  If the content is information about cancer, its treatments, cures and prevention and requests for the reader to take some action other than sending a contribution, then the public education function has

been fulfilled.  An audience selected because of its interest in cancer and other health related issues also indicates the reason for the mailing is public education.  Conversely, if the message is a direct appeal for funds and sent to individuals based on their ability to contribute money, then the fundraising function has been fulfilled.  All circumstances surrounding a mailing with regard to content and audience are examined together to arrive at the joint allocation of costs for each mailing between public education and fundraising.

In 1987, the Council incurred joint costs of $9,705,721 for informational materials and activities that included fundraising appeals.  Of those costs, $4,306,377 was allocated to public education and $5,399,344 was allocated to fundraising.  Expenses related to both * * * [prospect mailings and housefile mailings] were allocated to public education and fundraising based on the relative content and intent of each mailing without regard to intended audience.

NCIB did not accept petitioner's allocations of its 1985, 1986, and 1987 mailing campaign expenses to public education.  In preparing its reports on various charitable organizations, NCIB generally accepted the financial information contained in a charitable organization's financial statements, except for the charitable organization's allocation of its fundraising appeal expenses to exempt purpose activity.  While aware of SOP 78-10 and SOP 87-2, NCIB examined the reasonableness of the allocations made by the charitable organization.  For example, as indicated above, in a report it issued on petitioner, NCIB concluded that petitioner's fundraising expenses for 1985 equaled about 97.7 percent of the related contributions petitioner received.

With respect to petitioner's 1988 mailing campaign "joint expenses", petitioner's certified public accounting firm

experienced considerable difficulty in applying SOP 87-2 and was unable to conclude what portion of the 1988 direct mail campaign expenses qualified as joint expenses. The accounting firm essentially let petitioner itself decide how to categorize and allocate the expenses.

---

The compensation that W&H received under the Contract by way of direct payment by petitioner and by way of the value of W&H's use of the names generated by petitioner's fundraising efforts, exceeded reasonable compensation.

Respondent's revocation of petitioner's favorable letter ruling retroactively to the start of the Contract was not an abuse of discretion.

## OPINION

### I. Status Under Secs. 501(c)(3) and 170(c)(2)

Section 501(a) provides that "An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle".[21]

In order to be described in section 501(c)(3),[22] an

---

[21] Exceptions from this broad rule because of secs. 502 (relating to feeder organization), 503 (relating to prohibited transactions by certain categories of transactions), 501(b) (relating to unrelated business income), and various other provisions of the Code do not appear to be issues in the instant case.

[22] Sec. 501(c)(3) provides, in pertinent part, as follows:

(continued...)

organization must meet all of the following criteria: (1) it must be both (a) organized and (b) operated, exclusively[23] for certain specified exempt purposes, including charitable, educational, and scientific purposes; (2) no part of its net earnings may inure to the benefit of any private shareholder or

---

[22](...continued)
SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

        *    *    *    *    *    *    *

        (c) List Of Exempt Organizations.--The following organizations are referred to in subsection (a):

        *    *    *    *    *    *    *

        (3) Corporations * * * organized and operated exclusively for * * * charitable, scientific, * * * or educational purposes * * *, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * * and which does not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

The text includes an amendment made by sec. 10711(a)(2) of the Omnibus Budget Reconciliation Act of 1987 (OBRA 87), Pub. L. 100-203, 101 Stat. 1330, 1330-464. This amendment applies to activities after Dec. 22, 1987, the date of the enactment of the Act. This amendment relates only to political campaigns, and so does not affect the instant case.

[23] "Exclusively", in this context, means that there is no nonexempt purpose that is "substantial in nature". Better Business Bureau v. United States, 326 U.S. 279, 283 (1945); Living Faith, Inc. v. Commissioner, 950 F.2d 365, 370 (7th Cir. 1991), affg. T.C. Memo. 1990-484; Stevens Bros. Foundation, Inc. v. Commissioner, 324 F.2d 633, 638 (8th Cir. 1963), affg. on this issue 39 T.C. 93, 109 n.10 (1962).

individual; (3) no substantial part of its activities may consist of lobbying efforts; (4) no part of its activities may constitute intervention or participation in any political campaign on behalf of, or in opposition to, any candidate for public office (sec. 501(c)(3)); and (5) its purpose must not be "contrary to a fundamental public policy". Bob Jones University v. United States, 461 U.S. 574, 592 (1983). See generally, American Campaign Academy v. Commissioner, 92 T.C. 1053, 1062-1063 (1989). These requirements are stated in the conjunctive. Petitioner's failure to satisfy any of these requirements would be fatal to its qualification under section 501(c)(3). American Campaign Academy v. Commissioner, 92 T.C. at 1062; Stevens Bros. Foundation, Inc. v. Commissioner, 39 T.C. 93, 109-110 (1962), affd. on this issue 324 F.2d 633, 637-640 (8th Cir. 1963).

Donations to section 501(c)(3) organizations generally are deductible for income tax purposes under section 170. Secs. 170(a), 170(c); Bob Jones University v. Simon, 416 U.S. 725, 727-728 (1974). Section 170(c)[24] defines the term "charitable

---

[24] Sec. 170(c)(2) provides, in pertinent part, as follows:

SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

\* \* \* \* \* \* \*

(c) Charitable Contribution Defined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of--

\* \* \* \* \* \* \*

(continued...)

contribution" to mean a contribution or gift to or for the use of certain types of organizations enumerated thereunder.  With a few minor differences, the organizations and requirements listed in section 170(c)(2) are virtually identical to those described in section 501(c)(3).  In view of the nearly identical statutory language, the courts have applied many of the same standards in interpreting section 170(c)(2) and section 501(c)(3).  See Bob Jones University v. United States, 461 U.S. at 586-587.  For

---

[24](...continued)
            (2) A corporation * * *--

         (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;

         (B) organized and operated exclusively for  * * * charitable, scientific, * * * or educational purposes * * * ;

         (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

         (D) which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

The text includes an amendment made by sec. 10711(a)(1) of OBRA 87, Pub. L. 100-203, 101 Stat. 1330, 1330-464.  This amendment applies to activities after Dec. 22, 1987, the date of the enactment of the Act.  This amendment relates only to political campaigns and so does not affect the instant case.

convenience, we shall refer to section 501(c)(3), but our analysis and conclusions, in the context of the instant case, will apply equally to section 170(c)(2).

In the instant case, respondent contends only that (1) petitioner was not operated exclusively for exempt purposes because its "activities served private commercial purposes;" (2) petitioner "operated in large part for the private benefit of W&H;" and (3) petitioner's net earnings inured to the benefit of private shareholders or individuals. Respondent does not contend that petitioner is an "action" organization (sec. 1.501(c)(3)-1(c)(3), Income Tax Regs.), has not raised any contention that petitioner has failed to satisfy any of the other requirements discussed above for exemption under section 501(c)(3), and does not dispute petitioner's organization exclusively for exempt purposes. Respondent further acknowledges that respondent bears the burden of proof in establishing inurement, because respondent's notice of revocation did not indicate that inurement was a ground for the revocation. Rule 217(c)(2)(B); Dumaine Farms v. Commissioner, 73 T.C. 650, 659-660 (1980).

We note that while the inurement prohibition and the private benefit analysis under the operational test of the Treasury regulations may substantially overlap, the two are distinct requirements which must independently be satisfied. American Campaign Academy v. Commissioner, 92 T.C. at 1068-1069. However, it is not clear that the first two of respondent's contentions--

activities serving private commercial purposes, and operation for the private benefit of W&H--are meaningfully different requirements, at least in the context of the instant case.

We consider first the issue of inurement.

In order for an organization to qualify for exemption under section 501(c)(3), no part of the organization's net earnings may inure to the benefit of any private shareholder or individual. Sec. 501(c)(3); sec. 1.501(c)(3)-1(c)(2), Income Tax Regs.

A "private shareholder or individual" is broadly defined as any person having a personal and private interest in the activities of the organization. Sec. 1.501(a)-1(c), Income Tax Regs. Such private shareholders or individuals are sometimes referred to for convenience as "insiders". See American Campaign Academy v. Commissioner, 92 T.C. at 1066; Sound Health Association v. Commissioner, 71 T.C. 158, 185-186 (1978).

We consider first whether W&H was an insider with respect to petitioner, and then whether there was an inurement of petitioner's net earnings to W&H.[25]

A. W&H As Insider

---

[25]  Petitioner does not make the argument that W&H cannot be an insider under the statutory language because W&H is not a shareholder in petitioner and is not an individual. Accordingly, we do not consider that question. See Estate of Fusz v. Commissioner, 46 T.C. 214, 215 n.2 (1966). In any event, sec. 501(c)(3) deals with whether there is an inurement "to the benefit of any * * * individual". If there were an inurement to W&H, then it may well be that any such inurement would be "to the benefit of" W&H's owners--the individuals Watson and Hughey.

Petitioner maintains that (1) "the inurement doctrine applies only to <u>insiders</u> who receive an impermissible benefit from the organization, not to third parties with whom the exempt organization contracts for services" (emphasis in original); (2) petitioner was independent of W&H, and the two entities "had no common directors, officers or employees;" and (3) petitioner--and not W&H--had "control" in that (a) petitioner directed its charitable program, (b) petitioner "renegotiated the contract with W&H in mid-stream, gaining an important financial advantage," (c) petitioner "diligently exercised its right of review over all proposed mail copy, mailing lists, vendor's invoices, and volume and frequency of mailings", and (d) petitioner "exercised ultimate 'control' by terminating its relationship with W&H."

Respondent contends that "an 'insider's' control consists of a meaningful opportunity to influence any portion of the organization's activities that could readily be manipulated to the benefit of the insider." Respondent asserts that in the instant case "the record clearly shows that W&H controlled most of * * * [petitioner's] income and assets, including controlling most uses of (and all rental income from) * * * [petitioner's] donor and non-donor names, even after the five-year term of the contract."

Petitioner rejoins that its board of directors retained ultimate control, and, to the extent that any control over any

assets or activities was delegated to W&H, petitioner's board of directors exercised due diligence in supervising W&H's actions.

Mailers contends that, if a charity and an "outsider" negotiate a contract at arm's length, then the contract does not make that person an insider for inurement purposes with respect to that contract.  The contract between petitioner and W&H was negotiated at arm's length and was "market rate", Mailers asserts, and so W&H was not an insider and there was no inurement to W&H.

American-Sector contends that "the case law often labors to craft metaphysical distinctions between these requirements"--the ban on "private inurement", the ban on "private benefit", and the general requirement that a charity be organized and operated "exclusively for an exempt purpose".

We agree with respondent's conclusion.

The term "private shareholder or individual" appears at present in sections 170(c) (three places), 501(c) (eight places), 528(c)(1)(D), 833(c)(3)(A)(vi), 2055(a), 2522 (four places), and 4421(2)(B).  This term has been unchanged since the Revenue Act of 1924, Pub. L. 176, 68th Cong., 1st. Sess., ch. 234, 43 Stat. 253, 271, 282.  The Revenue Act of 1921, Pub. L. 98, 67th Cong., 1st Sess., ch. 136, 42 Stat. 227, 241, 253, used the term "private stockholder or individual", as did the prior Revenue Acts back to the Tariff Act of 1913, Pub. L. 16, 63d Cong., 1st. Sess., ch. 16, 38 Stat. 114, 172.  The term "private stockholder

or individual" also appears in section 38 of the Tariff Act of 1909, commonly called the Corporation Excise Tax Act of 1909, Pub. L. 5, 61st. Cong., 1st Sess., ch. 6, 36 Stat. 11, 113. Neither the parties nor the amici have directed our attention to, and we have not found, any statutory explanation of any of these terms. Our examination of the legislative history of the Revenue Act of 1924 has not turned up any explanation of the shift from "stockholder" to "shareholder". We note that the Administration's proposed bill leading to the Revenue Act of 1924 retained the word "stockholder", while the bill as reported by the House Ways and Means Committee used the word "shareholder". We note also that the term "private stockholder or individual" appears in paragraph (2) of section 2055(a) (and its 1939 Code predecessor, section 812(d)), while the term "private shareholder or individual" appears in paragraph (4) of the same section 2055(a). We have not found any explanation of the intended difference between "stockholder" and "shareholder", nor any reason why "stockholder" was replaced by "shareholder" in the Revenue Act of 1924. See Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. 338, 354 (1994), affd. 65 F.3d 90 (8th Cir. 1995).

Section 1.501(a)-1(c), Income Tax Regs., provides as follows:

> (c) "Private shareholder or individual" defined. The words "private shareholder or individual" in section 501 refer to persons having a personal and private interest in

the activities of the organization.

See sec. 1.501(c)(3)-1(c)(2), Income Tax Regs. This definition is unchanged from Regs. 65, art. 517 (1924), except that the older regulations use "individuals" and "corporation", instead of "persons" and "organization", respectively. Art. 517 of Regs. 65 is essentially similar to Regs. 45, art. 517 (1920). In general, the case law appears to have drawn a line between those who have significant control over the organization's activities and those who are unrelated third parties. People of God Community v. Commissioner, 75 T.C. 127, 133 (1980).

We proceed to consider whether, and if so then to what extent, W&H controlled petitioner's activities.

On the one hand, neither W&H nor Watson nor Hughey was a director or officer of petitioner, nor did any of them have a formal voice in the selection of any director or officer of petitioner.

On the other hand, in exchange for (a) funds to keep petitioner operational and get it past its 1984 financial crisis and (b) fundraising services, W&H received (1) compensation, (2) effectively exclusive control over petitioner's fundraising activities, including supposedly separate computer activities, and (3) substantial control over petitioner's finances. The amounts that W&H would advance for petitioner's operational costs and as capital for petitioner's fundraising costs were not

specifically contracted for, but were essentially discretionary with W&H.

Moreover, up until the execution of the April 1987 addendum to the Contract, petitioner was fully liable on a recourse basis to repay W&H for the excess draws petitioner received. This repayment liability caused petitioner's certified public accounting firm to express serious concern about petitioner's continued existence and economic viability, in the accounting firm's management letter dated May 23, 1986, to petitioner's board of directors and Executive Committee.

Although petitioner had a longstanding existence before its involvement with W&H, the position W&H occupied in relation to petitioner, during 1984 and 1985, was in many ways analogous to that of a founder and major contributor to a new organization. Petitioner, which was on the brink of insolvency, was being heavily financed and kept in existence by W&H pursuant to the fundraising arrangement that petitioner and W&H entered.

Petitioner became dissatisfied with its lack of control over the Escrow Account funds. In 1986 and 1987, petitioner made a number of concerted efforts to obtain more control over the Escrow Account. However, its efforts were unsuccessful as a result of W&H's refusal to give up control over the account. W&H continued to retain control over the Escrow Account long after it and petitioner knew the direct mail fundraising campaign was financially successful.

W&H's control over petitioner's fundraising campaign is further manifested by petitioner's unsuccessful efforts to obtain a copy of its own housefile in July 1988, about 11 months before the contract ended. W&H refused to provide to petitioner a copy of its housefile until the contract was over. It instructed Wiland, the computer company W&H selected to maintain petitioner's housefile, not to comply with petitioner's July 1988 request. Despite the extensive efforts of its attorney, petitioner was unable to obtain its complete housefile until after the Contract ended.

From a practical standpoint, W&H exercised substantial control over petitioner's finances and direct mail fundraising campaigns during the period from 1984 through 1989. In light of W&H's extensive control over petitioner and petitioner's near-insolvent financial condition when the fundraising arrangement was entered into in June 1984, we conclude that W&H was an "insider" with respect to petitioner.

Petitioner and Mailers contend that one cannot become an insider merely by entering into an arm's-length negotiated contract. We are not aware of any such "one-free-bite" principle in this part of the law. Whether the control thus transferred, or shared, makes the transferee an insider depends on the circumstances. The arrangement authorized by the Contract in the instant case was not a "one-shot deal", but a 5-year relationship, involving many transactions during its term. The

arm's-length negotiations may have a significant bearing on the fairness of the Contract, but they do not inoculate W&H against insider status.

Mailers makes a further argument along this line by pointing out that--

> even the definition of self-dealing provides that the term does not include 'a transaction between a private foundation and a disqualified person where the disqualified person status arises only as a result of such transaction.' Treas. Reg. §53.4941(d)-1(a).

However, the cited regulation explains this rule in the very next sentence, as follows:

> For example, the bargain sale of property to a private foundation is not a direct act of self-dealing if the seller becomes a disqualified person only by reason of his becoming a substantial contributor as a result of the bargain element of the sale.

Thus, the cited regulation (which does not apply to public charities anyway) focuses on the "one-shot deal" and does not appear to immunize a substantial course of dealing merely because the substantial course of dealing is pursuant to one contract (and its amendments and extensions).

We conclude that the cited regulation, fashioned in an environment of "disqualified persons" and "prohibited transactions", is distinguishable from what we face in the instant case, viz, "insiders" and "inurement".

We hold, for respondent, that W&H was an insider with regard to petitioner.

B. Did Any of Petitioner's Net Earnings Inure to W&H?

Petitioner points out that respondent has the burden of proof, and contends that respondent has failed to carry this burden.

Respondent acknowledges having the burden of proof, but contends that this burden has been carried because it was shown that W&H received "excessive and unreasonable compensation (and other private benefit)" from petitioner.

Mailers argues that private inurement does not result from a third-party contract for fair market value and contends that the Contract was at "Market Rate", especially in light of all the facts and circumstances when the Contract was executed.

We agree with respondent's conclusion.

An organization's payment of reasonable compensation to an insider for services performed for the organization would not constitute inurement of net earnings,[26] but payment of excessive compensation would. United States v. Dykema, 666 F.2d 1096, 1101 (7th Cir. 1981); Unitary Mission Church v. Commissioner, 74 T.C. 507, 514 (1980), affd. without published opinion 647 F.2d 163 (2d Cir. 1981). Whether the compensation in question is reasonable

---

[26] Neither side suggests that we should examine the statutory term "net earnings", and so we do not. See People of God Community v. Commissioner, 75 T.C. 127, 132 n.5 (1980); Alive Fellowship of Harmonious Living v. Commissioner, T.C. Memo. 1984-87 n.21; see also discussion in B. Hopkins, The Law of Tax-Exempt Organizations, sec. 13.4 (6th ed. 1992).

is a question of fact. <u>Founding Church of Scientology v. United States</u>, 188 Ct. Cl. 490, 412 F.2d 1197, 1200 (1969). Factors similar to those considered in determining reasonable compensation under section 162(a)(1) are examined. <u>Founding Church of Scientology v. United States</u>, <u>supra</u>; <u>B.H.W. Anesthesia Foundation v. Commissioner</u>, 72 T.C. 681, 686 (1979). In determining whether there has been an inurement of net earnings we are to consider all forms of compensation, and not merely direct payments from the organization to the insider. <u>Founding Church of Scientology v. United States</u>, <u>supra</u>; <u>Unitary Mission Church v. Commissioner</u>, 74 T.C. at 512-513.

A cap or limit on the contingent compensation that may be earned under a particular incentive formula, can be considered a factor supporting the reasonableness of that contingent compensation arrangement. See <u>People of God Community v. Commissioner</u>, 75 T.C. at 132.

At trial, petitioner and respondent offered the testimony of several expert witnesses on the issue of whether W&H received more than reasonable compensation. As trier of fact, we are not bound by the opinion of any expert witness and will accept or reject expert testimony, in whole or in part, in the exercise of sound judgment. <u>Helvering v. Nat. Grocery Co.</u>, 304 U.S. 282, 295 (1938); <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), and cases there cited, affg. T.C. Memo 1974-285.

Petitioner offered the testimony of three expert witnesses: (1) James Feldman (hereinafter sometimes referred to as Feldman), a professional direct mail marketing and fundraising consultant; (2) J. Curtis Herge (hereinafter sometimes referred to as Herge), an attorney practicing in the Washington, D.C., area, who has advised nonprofit organizations and professional fundraisers about fundraising contracts and represented such clients in the negotiation of their fundraising contracts; and (3) Richard S. Steinberg (hereinafter sometimes referred to as Steinberg), an economist who has specialized in the economics of nonprofit organizations.

Respondent offered the testimony of four expert witnesses: (1) Nora Carrol (hereinafter sometimes referred to as Carrol), a professional fundraising and marketing consultant, (2) John Kehoe (hereinafter sometimes referred to as Kehoe), a professional fundraiser who at the time of the trial specialized in mailing list brokerage services, (3) William C. McGinly (hereinafter sometimes referred to as McGinly), president of the Association for Healthcare Philanthropy, a professional organization of health care facility and hospital executives concerned with fundraising, marketing, and public relations, for nonprofit health care facilities and hospitals, and (4) Robert S. Tigner (hereinafter sometimes referred to as Tigner), general counsel for the Association of Direct Response Fundraising Counsel

(hereinafter sometimes referred to as ADRFCO), a professional organization of professional fundraising companies that provide direct response consulting services to nonprofit organizations.

Herge attached to his expert report copies of 21 fundraising agreements for various nonprofit organizations filed with Virginia's Office of Registrations, Division of Consumer Affairs. Herge asked the Virginia Office of Registrations to provide him with copies of all fundraising agreements filed with it by up to 10 to 12 professional fundraisers during a specified time period. From the agreements thus provided, Herge selected agreements which he believed were representative and typical of the agreements similar to petitioner's found in the market place.

These 21 fundraising agreements were entered into during the period from 1984 through 1992. They involve various professional fundraisers and client organizations. Nineteen of the 21 client organizations involved in these agreements have been recognized by respondent as being exempt from Federal income tax either under section 501(c)(3), 501(c)(4), or 501(c)(5). Four of the 21 agreements essentially provide that the nonprofit organization client is fully liable on a recourse basis for the fundraising expenses. The remaining 17 agreements are essentially "no-risk" contracts for the nonprofit organization. However, a few of the essentially "no-risk" agreements require the nonprofit organization client to either contribute a specified amount of

the initial capital to conduct the mailing campaign or bear financial responsibility for certain specified types of expenses.

Without going into an analysis of each of these expert witness' testimony, we draw the following overall conclusions from their testimony:

1. Contingent-fee charitable fundraising arrangements occur with modest frequency. Although some in the fundraising field regard such arrangements as being improper, others treat such arrangements as an ordinary part of the fundraising landscape. It is expected that a fundraising arrangement with a contingent-fee element would present opportunities for greater total compensation for the fundraiser than a similar fundraising arrangement that does not have a contingent-fee element.

2. No-risk charitable fundraising arrangements occur with less frequency. They may take various forms, most of which may more appropriately be labeled as "limited risk", rather than "no-risk". It is expected that a fundraising arrangement with a no-risk or limited-risk element would involve greater total compensation for the fundraiser than a similar fundraising arrangement that does not have a no-risk or limited-risk element.

3. As petitioner's experts Feldman and Herge point out, co-ownership of mailing lists is typical in no-risk charitable fundraising arrangements and is regarded as a method of enhancing compensation to the fundraiser without requiring the charitable

organization client to actually write checks.  Although such co-ownership is understood to be an element of compensation, it has the side effect of making it more difficult to determine what is the total compensation to the fundraiser.  Note that petitioner's Form 990 did not report this as an element of compensation paid, and respondent does not suggest that petitioner should have tried to find out how much W&H earned as a result of this feature of the fundraising agreement.  In the instant case, the co-ownership had features that significantly restricted petitioner's use of its own mailing list.[27]  Under section 18 of the Contract, all of these restrictions even survive the term of the Contract.  In addition, W&H and petitioner interpreted the Contract to permit W&H to exchange petitioner's mailing list for another organization's mailing list and then require petitioner to "reimburse" W&H for the expense that W&H did not in fact incur because of the exchange of mailing lists.  A side effect of this feature is that in such a situation a payment by petitioner to W&H which appeared to be a simple reimbursement of W&H's out-of-pocket expenses would in fact have been additional compensation by petitioner to W&H.

---

[27] See sec. 14 of the Contract, set forth supra.  The Contract expressly forbids petitioner to "rent, exchange, lease, sell or give away" the names and addresses that W&H develops "to any other parties for any purpose whatsoever."  On the other hand, the Contract expressly permits W&H to use these names and addresses "in any way it so desires and for any purpose it may so determine."

4. Petitioner's mailing fees under the Contract--$0.05 per prospect letter and $.10 per housefile letter--were within, but about the high end of the range of charges in what Herge described as a representative group of fundraising contracts. Petitioner was charged package fees for housefile mailings under the Contract. In Herge's group of contracts, package fees were ordinarily found only in conjunction with lower mailing fees; in only one instance in this group (The Viguerie Co.'s contract with The Solidarity Endowment) was there both a package fee and a high mailing fee. As Tigner points out, it is difficult to evaluate the reasonableness of a particular mailing fee unless one understands the volume of mailings that are anticipated. In general, the greater the volume of mailings anticipated, the smaller the mailing fees. This relationship was clearly recognized in five of the fundraising contracts in Herge's group of contracts, involving four different fundraisers, which provided graduated mailing fees, depending on the volume of mailings actually sent. Thus, when the parties to a fundraising contract do not have a basis for confidently estimating the volume of mailings to be sent, a graduated mailing fee schedule is a device that may be used to protect both sides. In April 1986 petitioner and W&H agreed to a cap on housefile mailing fees in exchange for a reduction, from 70 to 50 percent, in the cumulative net income from housefile mailings that petitioner was

guaranteed to receive.  The $50,000 cap applied to any single housefile mailing of more than 500,000.

5.  In almost all of Herge's group of contracts the exempt organization could terminate the fundraising contract with some form of advance notice.  The longest notice so required is 120 days and the shortest is 30 days.  Often these contracts provide that an exempt organization that terminates its fundraising contract becomes liable for mail campaign losses.  In contrast, the Contract does not make any provision for petitioner to terminate it by giving notice or for cause.  On the contrary, the Contract provides that, during its entire 5-year term, W&H would be petitioner's exclusive fundraiser, and specifically forbids petitioner to "retain or use the services of any other person or company to provide counsel or advice to [petitioner] in conducting its direct mail solicitations."

Thus, W&H had an effective way to limit its risk if the Contract did not prove to be productive--W&H could reduce or eliminate the monthly draws that it allows petitioner to take and it could end the advances used to fund future mailings for petitioner.  Once petitioner had grown accustomed to this lifeline, petitioner could not remain viable without continued infusions; W&H could figuratively pull petitioner's plug and thereby effectively rid itself of future losses or insufficiently profitable obligations.  Petitioner, on the other hand, had no exit.  Presumably, petitioner could have refused to authorize

more mailings, but petitioner could not use another fundraiser no matter how unhappy it was with how the Contract was working out. This suggests that the uncertainties normally attendant on a no-risk contingent fee arrangement warranted less of a premium to W&H under the circumstances of the Contract than might be appropriate in the usual run of no-risk contingent fee cases.

The dollar amounts in some of the tables set forth supra in our Findings of Fact in many instances do not properly match the dollar amounts in other tables. This results from the inconsistent and usually unreconciled exhibits that the parties introduced in the extensive record in the instant case. Nevertheless, the following conclusions may fairly be drawn from the information we have:

1. W&H's services under the Contract netted petitioner about $2¼ million for its own uses unrelated to the Contract. Tables 1, 2, and 10.

2. This net is less than 10 percent of what donors contributed to petitioner in the fundraising campaign. Tables 1 and 10.

3. Petitioner directly paid more than $4 million to W&H as fundraising fees. Tables 3 and 7.

4. In addition, petitioner paid almost $4 million to Washington Lists, a division of W&H, for list rental fees and commissions. Tables 4 and 7.

5. More than 10 percent of petitioner's payments to

Washington Lists were for rentals of lists that W&H or Washington Lists had obtained at little or no cost by exchanging petitioner names.  Table 8.

6. Although the record does not show how much W&H or Washington Lists profited from being able to use petitioner names for mailing list exchanges on behalf of W&H's other clients, it does show that about 5 percent of petitioner's payments to Washington Lists were for rentals of lists that W&H or Washington Lists had obtained at little or no cost by exchanging W&H masterfile names.  Table 8.

At trial, Watson testified that the mailing fee rates that W&H charged to petitioner under the Contract were equal to the highest rates that he understood professional fundraisers in the Washington, D.C., area charged their nonprofit organization clients in no-risk fundraising contracts.  In his letter dated June 1, 1987, to petitioner's executive director, Watson proposed that petitioner and W&H agree to an early renewal of the Contract and enter into a new proposed contract that would replace and supersede the Contract.  Under the proposed contract Watson enclosed, W&H's mailing fees would be reduced from $.05 to $.03 per prospect letter and from $.10 to $.07 per housefile letter.

When W&H entered into contracts with AICR on a no-risk basis, AICR's mailing fees were 20 percent less than what petitioner had to pay, and AICR did not also have to pay package fees.  Supra table 5.  The second 1983 AICR contract and the 1984

AICR contract, both of which were entered into before the Contract, showed W&H's understanding of the uses of graduated mailing fees.

The market, as exemplified by Herge's sample of fundraising contracts, provided two significant checks on excessive compensation in no-risk situations--early termination rights for the exempt organization (almost all the contracts) and graduated mailing fee (five contracts).  Until the April 1986 agreement, the Contract did not provide either of these checks on the effect of high mailing fees, thereby reducing the market justification for charging what Watson acknowledged to be equal to the highest rates in the Washington, D.C. area.

Although our inquiry in the instant case is to some extent similar to that in section 162(a)(1) cases, this inquiry is easier in one important respect--if we determine that there is excess compensation in a section 162(a)(1) case, then we must set a dollar amount on that excess, while in the instant case we merely have to determine whether there is excess compensation and need not then set a dollar amount.  Airlie Foundation, Inc. v. United States, 75 AFTR 2d 95-2068, 95-2070, 95-1 USTC par. 50279 (D.C. Cir. 1995); Orange County Agr. Soc., Inc. v. Commissioner, 893 F.2d 529, 534 (2d Cir. 1990), affg. T.C. Memo. 1988-380; see Church of Scientology of California v. Commissioner, 823 F.2d 1310, 1316 (9th Cir. 1987), affg. 83 T.C. 381, 491-492 (1984); Founding Church of Scientology v. United States, 412 F.2d at

1202; Unitary Mission Church v. Commissioner, 74 T.C. at 513. But see Carter v. United States, 973 F.2d 1479, 1486 n.5 (majority opinion), 1489-1490 (Tang, J., concurring in part and dissenting in part) (9th Cir. 1992).

The instant case does not involve an insider's embezzlement or any other kind of theft or use of assets unbeknownst to the other insiders. What we conclude to be excessive compensation resulted from what petitioner and W&H apparently believed the Contract permitted or required. The fact that the Contract was bargained for is a significant factor pointing toward reasonableness. Sec. 1.162-7(b)(2), Income Tax Regs. However, even under the standards of section 162(a)(1) the bargaining factor does not by itself conclusively protect an arrangement from a determination that the compensation was unreasonable; we are required to consider all the circumstances. Sec. 1.162-7(b)(3), Income Tax Regs.

Our examination of the other contracts provided by Herge, of the multiplicity of compensation sources that W&H had under the Contract, of the open-ended nature of W&H's charges under the Contract even though graduated fees were already being used in the industry--and specifically by W&H in connection with AICR-- convinces us that the initial risk that W&H bore did not justify so high a level of compensation. We are not holding that an arm's-length arrangement that produces a poor result for an organization necessarily would cause the organization to lose its

tax-exempt status.  We conclude, and we have found, that the compensation that W&H received under the Contract by way of direct payment by petitioner and by way of the value of W&H's use of names generated by the fundraising efforts that petitioner already paid for, exceeded reasonable compensation.

As a result, we conclude that, as of the June 11, 1984, date on which the Contract started, the Contract was not a reasonable contingent compensation arrangement, that W&H's compensation under the Contract exceeded reasonable compensation, and that thus there was an inurement to an insider, in violation of the restrictions in sections 501(c)(3) and 170(c)(2)(C).

It is suggested that the $2¼ million that petitioner cleared during the course of the Contract may justify such high compensation.  However:  (1) The $2¼ million is so small in comparison to the amounts of contributions, of W&H compensation, of postage and shipping costs, of printing and publications costs, and of mailing list rental costs, as to be almost an incidental product of the fundraising campaign; and (2) W&H was supposed to provide a substantial asset to petitioner--a housefile that petitioner could exploit in future fundraising (see supra findings under Direct Mail Fundraising)--but W&H's services were a practical failure in this regard.  Thus, the magnitude of W&H's compensation is not justified by adequacy of results.

We hold for respondent on this issue.

## II. Retroactivity of Respondent's Revocation of the Prior Favorable Ruling Letter Issued to Petitioner

Petitioner contends that it was improper for respondent to revoke the prior favorable ruling letter retroactively to June 11, 1984, the date on which petitioner entered into the Contract. Petitioner contends that the retroactivity of the revocation (1) violates its Fifth Amendment due process rights and (2) constitutes an abuse of respondent's discretion under section 7805(b). Petitioner's constitutional arguments were considered and dealt with in United Cancer Council, Inc. v. Commissioner, 100 T.C. 162 (1993), and in the hearing that preceded that opinion. Petitioner asks the Court "to reconsider our previously detailed arguments, and we also note our preservation of the issues in the event of an appeal." We believe that our earlier rulings in this matter were correct and that there is no need to restate them. We proceed to consider the abuse-of-discretion issue under section 7805(b).[28]

---

[28] Sec. 7805(b) provides as follows:

SEC. 7805. RULES AND REGULATIONS.

      \*   \*   \*   \*   \*   \*   \*

(b) Retroactivity of Regulations or Rulings.--The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

This provision was extensively revised by sec. 1101(a) of the Taxpayer Bill of Rights 2, Pub. L. 104-168, 110 Stat. 1452, 1468 (1996), effective for regulations which relate to statutory

(continued...)

The Supreme Court has held that respondent has broad discretion under section 7805(b) and its predecessor, in deciding to revoke a ruling retroactively, and that such a determination is reviewable by the courts only for abuse of that discretion. Automobile Club v. Commissioner, 353 U.S. 180, 184 (1957); see Dixon v. United States, 381 U.S. 68 (1965).  See generally, Virginia Education Fund v. Commissioner, 85 T.C. 743 (1985), affd. 799 F.2d 903 (4th Cir. 1986).

More recently, in a different but analogous setting, we described review of exercise of discretion as follows:

> Whether the Commissioner has abused his discretion is a question of fact.  Buzzetta Construction Corp. v. Commissioner, 92 T.C. 641, 649 (1989); Estate of Gardner v. Commissioner, 82 T.C. 989, 1000 (1984).  In reviewing the Commissioner's actions, however, we do not substitute our judgment for the Commissioner's, nor do we permit taxpayers to carry their burden of proof by a mere preponderance of the evidence.  Buzzetta Construction Corp. v. Commissioner,

---

[28](...continued)
provisions enacted after July 30, 1996, and so does not affect the instant case.  We note that present sec. 7805(b)(8) provides as follows:

SEC. 7805. RULES AND REGULATIONS.

\* \* \* \* \* \* \*

(b)  Retroactivity of Regulations.--

(8) Application to rulings.--The Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect.

92 T.C. at 648; <u>Mailman v. Commissioner</u>, 91 T.C. 1079, 1084 (1988); <u>Pulver Roofing Co. v. Commissioner</u>, 70 T.C. 1001, 1011 (1978). Taxpayers are required to clearly show that the Commissioner's action was arbitrary, capricious, or without sound basis in fact. <u>Knight-Ridder Newspapers v. United States</u>, 743 F.2d 781, 788 (11th Cir. 1984); <u>Mailman v. Commissioner</u>, 91 T.C. at 1084; <u>Drazen v. Commissioner</u>, 34 T.C. 1070, 1076 (1960). [<u>Capital Federal Savings & Loan v. Commissioner</u>, 96 T.C. 204, 213 (1991).]

The Contract caused the inurement violation. It is not "arbitrary, capricious, or without sound basis in fact" for respondent to determine that the revocation of the favorable ruling letter should relate back to the start of the Contract.

Neither the parties nor the amici refer to section 601.201(n)(6), Statement of Procedural Rules, nor to Rev. Proc. 90-27, 1990-1 C.B. 514, both of which provide, in pertinent part, that "The revocation [of an exemption ruling] * * * may be retroactive if the organization * * * operated in a manner materially different from that originally represented". The start of the Contract marked a substantial change in petitioner's operations. This change was material with respect to inurement. Petitioner has not suggested that there was any event after the start of the Contract which marked a change in W&H's actions, or W&H's rights under the Contract, such that there was an inurement after that event or change but not before that event or change. If the revocation, which occurred after the Contract expired, had been made prospective only, then the revocation would have been a meaningless act.

We conclude that (1) the retroactivity of the revocation to

the start of the Contract is not an abuse of discretion when tested by the usual standards, (2) petitioner does not maintain that these standards have been modified as a result of section 601.201(n)(6), Statement of Procedural Rules, or Rev. Proc. 90-27, and (3) the retroactivity would not be an abuse of discretion even if the usual standards were so modified.  See <u>Capital Federal Savings & Loan v. Commissioner</u>, 96 T.C. at 217-219, 223.

    We hold that respondent's determination, that the revocation be retroactive to the start of the Contract, was not an abuse of discretion.

---

    In light of our holdings for respondent, we do not consider whether petitioner should be denied tax-exempt status for other reasons, whether anyone's actions violated postal regulations and if so what effect that should have on petitioner's exempt status, whether petitioner and W&H engaged in a joint venture, whether a portion of petitioner's expenses is properly allocable to public education, or whether any particular feature of the Contract constituted a "per se" violation of any of the requirements of sections 501(c)(3) and 170(c)(2).  Finally, section 4958, imposing an excise tax on "excess benefit transactions", applies only to transactions occurring on or after September 14, 1995, and so does not apply to the instant case.

<u>Decision will be entered</u>

<u>for respondent</u>.